**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| BRENDA MCKINNEY, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: 1:23-cv-1372 |
| | JURY TRIAL DEMANDED |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendant. | |

**<u>CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ......................................................................... 3

III.    PARTIES ............................................................................................................ 4

IV.     FACTS ................................................................................................................ 6

        A.      For nearly 200 years, HBCUs have served as institutions of higher
                education with the intention of primarily serving the Black community. ............ 6

        1.      The role of HBCUs in education. ......................................................................... 6

        2.      The history of HBCUs in NCAA athletics. .......................................................... 9

        B.      The NCAA's Academic Performance Program discriminates against
                HBCUs based on race. ....................................................................................... 14

        1.      The NCAA requires student-athletes to comply with regulations governing
                all aspects of their lives...................................................................................... 14

        2.      The NCAA's serial academic requirements have historically discriminated
                against Black student-athletes at HBCUs. ......................................................... 16

        3.      The NCAA discriminated against Black Student-Athletes at HBCUs when
                it considered race in the design and implementation of the APP. ...................... 21

        4.      An HBCU team is 43 times more likely to receive a postseason ban than a
                PWI team. ........................................................................................................... 32

        5.      The NCAA uses the APP to reward PWIs............................................................ 34

        C.      Class members have been injured by or are at risk of injury because of the
                APP. .................................................................................................................... 35

        1.      The NCAA's conduct interferes with student-athletes' ability to make and
                enforce contracts—their Contracts. ................................................................... 35

        2.      The NCAA's conduct creates an increased risk that Black student-athletes
                at Division I HBCUs will suffer irreparable harm............................................. 36

V.      TOLLING OF STATUTE OF LIMITATIONS ............................................. 37

VI.     CLASS ALLEGATIONS ................................................................................. 38

VII.    CAUSES OF ACTION ..................................................................................... 40

VIII.   PRAYER FOR RELIEF ................................................................................... 48

Plaintiff Brenda McKinney on behalf of herself and the Injunctive Relief Class described below, by and through her attorneys, brings this class action complaint against the defendant, the National Collegiate Athletic Association ("NCAA"), for injunctive relief on the same bases as alleged in *Manassa v. National Collegiate Athletic Association*, No. 1:20-cv-3172-RLY-MJD. Based on the investigation of counsel, Plaintiff alleges as follows:

## I.   INTRODUCTION

1.   The NCAA proclaims in its Constitution:

> The Association shall promote an atmosphere of respect for and sensitivity to the dignity of every person. It is the policy of the Association to refrain from discrimination with respect to its governance policies, educational programs, activities and employment policies including on the basis of age, color, disability, gender, national origin, race, religion, creed or sexual orientation.

NCAA Const., Art. 2.6.

2.   Such a creed should allow Historically Black Colleges and Universities ("HBCUs"[1]), defined as "any historically black college or university that was established prior to 1964, whose principal mission was, and is, the education of black Americans," and their students to thrive in the NCAA. Focused on a community that has been historically left behind, HBCUs largely enroll low-income, first-generation, and historically disadvantaged Black[2] students.

3.   However, despite the NCAA's fundamental promise to "refrain" from discriminating based on race in educational programs, the NCAA has a long history of

___

[1] 20 U.S.C. §§ 1060, 1061(2).

[2] We use the term "Black" throughout this Complaint to represent African Americans, individuals of African descent, and/or Black people.

discriminating against Black student-athletes and teams at HBCUs through implementation of its so-called academic reforms.

4.     Most recently, the NCAA designed and implemented the Academic Performance Program ("APP"), which penalizes a team if it does not meet or exceed a threshold number of points based on the team members' academic performance and other indicators. Highest tier penalties include banning a team from postseason competition.

5.     The formula on which the APP is based includes metrics that the NCAA knew would discriminate against Black student-athletes at HBCUs.

6.     The NCAA's design and implementation of the APP perpetuates a system that punishes Black student-athletes at HBCUs because of the HBCUs' unique and historical role in the education of Black people within the systemic vestiges of discrimination. In fact, the NCAA has admitted that "a higher proportion of HBCU teams have been subject to APP penalties" than predominantly white institutions ("PWI").

7.     An HBCU team is 43 times more likely to receive a postseason competition ban than a PWI team. While just 6.5% of NCAA Division I schools are HBCUs (23 out of 350), 72% of the teams that have been banned from postseason competition since 2010 are from HBCUs (114 of 159).

8.     This substantial impact is more than a random or indirect consequence of the NCAA's well-intentioned policies. One commentator called the APP "polite racism." We call it illegal.

9.     The NCCA's adoption and continued enforcement of the APP, including its penalty structure and postseason access bans, together with the NCAA's prior academic

propositions and reforms, represent a pattern or practice of intentional discrimination against Black student-athletes at HBCUs on the basis of race.

10.     As a Black student-athlete on the women's basketball team at HBCU Grambling State University, Plaintiff brings this action on behalf of herself and all current Black student-athletes at HBCUs for racial discrimination in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 1985.

11.     Plaintiff, a current NCAA Division I student-athlete attending an HBCU, seeks injunctive relief in the form of a permanent injunction to prevent the NCAA from imposing or enforcing the APP. She further seeks equitable relief in the form of a monitor to ensure that the NCAA does not discriminate against Black student-athletes at HBCUs through, e.g., academic benchmarks, penalties, or rewards.

## II.     JURISDICTION AND VENUE

12.     Plaintiff brings claims pursuant to 42 U.S.C. §§ 1981, 1985. This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. § 1331.

13.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; (c) at least one Plaintiff is a citizen of a different state than at least one Defendant; and (d) members of the class are citizens of a state and at least one of the Defendants is a citizen or subject of a foreign state.

14.     This Court has personal jurisdiction over the NCAA as an unincorporated association residing and conducting operations in this District.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the NCAA resides in this District.

## III.    PARTIES

16.    Plaintiff Brenda McKinney is, as of the date of the filing of this complaint, a current student at Grambling State University, which is a Division I HBCU. Ms. McKinney is a member of the women's basketball team at Grambling State University and will play basketball in the 2023-2024 academic year. She also intends to play basketball for Grambling State University in the 2024-2025 academic year.

17.    Defendant NCAA is an unincorporated association that acts as the governing body of college sports. Its principal office is in Indianapolis, Indiana. According to its 2018 IRS Form 990, its gross receipts were $1,222,405,932 and net assets were $425,995,451.

18.    In 1952, the NCAA imposed rulemaking and enforcement authority over its members.[3] Today, its Constitution, Bylaws, and regulations dictate member institution and student-athlete conduct, ethics, and eligibility. NCAA staff are empowered to issue binding interpretations of NCAA rules.

19.    An "NCAA 101" fact sheet published by the NCAA explains that "[t]he National Collegiate Athletic Association is a member-led organization dedicated to the well-being and lifelong success of college athletes."[4] "The 500 employees at the NCAA's Indianapolis

---

[3] "Joint Stipulation of Facts Concerning the NCAA," *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litig.*, Case No. 4:14-md-02541-CW, Dkt. 1098 at ¶ 23 (N.D. Cal. October 15, 2018).

[4] NCAA, What is the NCAA?, NCAA, http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (last visited July 27, 2023).

headquarters interpret and support member legislation, run all championships and manage programs that benefit student-athletes."[5]

20.     Since 1973, the NCAA's member schools have been organized into three divisions—Division I, Division II, and Division III. Each Division has a particular set of rules and guidelines governing athletics.

21.     Division I ("DI"), the most prestigious division, contains approximately 350 of the NCAA's 1200 member schools. It is governed by a Division I Council (comprised of DI sports practitioners) and a Board of Directors (comprised of 12 presidents and chancellors from each conference) and includes numerous committees. The DI Committee on Academics ("COA") has "primary academic authority" for Division I, which includes administering the Academic Performance Program and managing eligibility standards.[6] COA reports to the DI Board of Directors, and can recommend legislation to the DI Council.[7] The Board is responsible for enacting policy and legislation that governs DI.[8]

22.     DI includes two levels of football: the Football Bowl Subdivision ("FBS") and the Football Championship Subdivision ("FCS"). Within DI, there are 32 conferences, each of which may enact and enforce conference-specific rules, as long as they are consistent with the NCAA Constitution and bylaws.

23.     The most prestigious level of DI football competition—FBS—contains ten athletic conferences and seven independent schools. The five top FBS conferences —the Atlantic

---

[5] *Id.*

[6] NCAA Operating Bylaws, 21.3.2, NCAA Division I Manual 2023-24, *available at* https://web3.ncaa.org/lsdbi/reports/getReport/90008 (last visited Aug. 1, 2023).

[7] *Id.*

[8] *Id.* at 21.1.2.

Coast conference ("ACC"), Big Ten Conference, Big 12 Conference, Pac-12 Conference, and Southeastern Conference ("SAC") —are known by the moniker: the "Power Five." The remaining DI-FBS schools are referred to as the "Group of Five."

## IV.   FACTS

**A.   For nearly 200 years, HBCUs have served as institutions of higher education with the intention of primarily serving the Black community.**

### 1.   The role of HBCUs in education.

24.   Historically, education of Black individuals in the United States, including enslaved persons, was prohibited.[9]

25.   The Civil War ended slavery but did not provide Black people access to white institutions or white educational systems. HBCUs thus developed as a way to educate formerly enslaved persons and all Black individuals, becoming the primary avenue for providing postsecondary education to Black students.[10]

26.   These efforts persisted despite Ku Klux Klan violence towards and intimidation of Black educators, schools, and students. In response, Congress passed the Ku Klux Klan Act of 1871,[11] outlawing conspiracies to deprive citizens of their constitutional rights (including the right to equal protection).

27.   The development of HBCUs was aided by the Second Morrill Act of 1890 which required that, when states with racially segregated public higher education systems provided a

---

[9] A History of Historically Black Colleges and Universities, HBCU First, https://hbcufirst.com/resources/hbcu-history-timeline (last visited July 28, 2023); U.S. Dept. of Educ., Office of Civil Rights, Historically Black Colleges and Universities and Higher Education Desegregation, U.S. Dept. of Educ. (March 1991), https://nature.berkeley.edu/agroecologylab/wp-content/uploads/2020/06/Historically-Black-Colleges-and-Universities-and-Higher-Education-Desegregation.pdf

[10] U.S. Dept. of Educ., Office of Civil Rights, *supra*, n. 13.

[11] 42 U.S.C. § 1985.

land grant to benefit white students, they also had to provide a land grant for the benefit of Black students.[12] As a result, additional institutions dedicated to Black students – now referred to as HBCUs – received land and were established across the South.

28.    "Despite the narrow scope of their intended function, HBCUs grew into significant institutions in the production of research, particularly on the African diaspora. [HBCUs] became the primary teachers of the previously under and uneducated populace, central repositories of cultural heritage, and stalwart beacons for community uplift."[13] HBCUs accepted students "as they were," including educating those who were underprepared or had "minimal skills."[14]

29.    HBCUs thus comprised the backbone of the educational system for Black students, educating future teachers, doctors, lawyers, and ministers who would serve the Black community in what was still a racially segregated society. Almost all Black college students during this period enrolled at HBCUs.[15]

30.    The Supreme Court's decision in *Plessy v. Ferguson*, 163 U.S. 537 (1896), reinforced America's segregated educational system. Although it required that Black and white schools be "separate but equal," they were not.

---

[12] U.S. Dept. of Educ., Office of Civil Rights, *supra*, n.13. *See* Louis B. "Skip" Perkins, Jr., An Examination of Historically Black Colleges and Universities' (HBCU) Intercollegiate Athletic Directors' Utilization and Effectiveness of Resources to Foster Student-Athlete Academic Success: A Comparative Case Study Analysis (May 2018) (Ph.D. dissertation, Delaware State University) (*available at* https://desu.dspacedirect.org/bitstream/handle/20.500.12090/283/Perkins_desu_1824E_10084.pdf?isAllowed=y&sequence=1).

[13] M. Christopher Brown II and Ronyelle Bertrand Ricard, *The Honorable Past and Uncertain Future of the Nation's HBCUs*, THE NEA HIGHER EDUCATION JOURNAL, Fall 2007, at 120.

[14] *Id.*

[15] U.S. Dept. of Educ., Office of Civil Rights, *supra*, n.13.

31.     Black schools, including HBCUs, had fewer resources, poorer facilities, inadequate libraries, and smaller budgets than white institutions, and they received less support from state and federal governments.[16]

32.     Although the Supreme Court overruled *Plessy* in *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), many state and local governments were extremely slow to comply with desegregation and the vestiges of discrimination were deeply engrained in society, not the least of which was in higher education.

33.     Today there are 101 HBCUs in 19 states that enroll almost 300,000 students, approximately 80% of whom are Black, 70% of whom are from low-income families, and many of whom are first-generation students.[17] Although HBCUs represent only 3% of all four-year nonprofit colleges and universities, they enroll 10% of all Black students nationally.

34.     HBCUs have awarded 20% of all bachelor's degrees earned by Black students and 18% to 25% of bachelor's degrees earned by Black students in science, technology, engineering, and mathematics since the mid 2000s.[18] HBCUs have produced 80% of the Black

---

[16] *Id.;* Autumn A. Arnett, Funding at HBCUs Continues to be Separate and Unequal, Diverse Issues in Higher Education (May 31, 2015), https://diverseeducation.com/article/73463/.

[17] United Negro College Fund, HBCUs Make American Strong: The Positive Economic Impact of Historically Black Colleges and Universities, UNCF, https://cdn.uncf.org/wp-content/uploads/HBCU_Consumer_Brochure_FINAL_APPROVED.pdf?_ga=2.73503766.523917533.1603817862-147757049.1603817862 (last visited July 28, 2023); Krystal L. Williams and BreAnna L. Davis, "Public and Private Investments and Divestments in Historically Black Colleges and Universities," ACE AND UNCF ISSUE BRIEF, January 2019 at 1 (available at https://www.acenet.edu/Documents/Public-and-Private-Investments-and-Divestments-in-HBCUs.pdf).

[18] The UNCF Fact Sheet,  https://uncf.org/wp-content/uploads/2020-UNCF-Fact-Sheet.pdf?_ga=2.182072615.1855188980.1625171888-940391410.1625171888 (last visited Aug. 1, 2023).

judges, 50% of the Black lawyers, 50% of the Black doctors, 40% of the Black engineers, 40% of the Black members of Congress, and 13% of the Black CEOs in America today.[19]

35.     Prominent HBCU graduates include Vice President- Kamala Harris, Jesse Jackson, Martin Luther King, Jr., Thurgood Marshall, and Toni Morrison, as well as NFL stars such as Jackson State's Walter Payton, Mississippi Valley State's Jerry Rice, and Alcorn State's Steve McNair, who finished third in Heisman voting in 1994. Doug Williams, a Grambling alumnus, became the first Black quarterback to win a Super Bowl in 1988.

36.     HBCUs have been and continue to be committed to "the preservation of Black history, racial pride, ethnic traditions, and Black consciousness."[20] A recent Gallup study concluded that HBCUs "are successfully providing black graduates with a better college experience than they would get at non-HBCUs."[21]

### 2.  The history of HBCUs in NCAA athletics.

37.     The NCAA was established in 1906 by all white leaders at schools in the Ivy League as a non-profit, "voluntary" association, which is now comprised of nearly 1,200 member colleges and universities. Today, it controls the governance and regulation of college sports.

---

[19] Jemele Hill, *It's Time for Black Athletes to Leave White Colleges*, The Atlantic, October 2019, https://www.theatlantic.com/magazine/archive/2019/10/black-athletes-should-leave-white-colleges/596629/

[20] Brown and Ricard, *supra* n.17, at 121.

[21] 2015 Gallup-USA Funds Minority College Graduates Report at 7, https://www.gallup.com/services/186359/gallup-usa-funds-minority-college-graduates-report-pdf.aspx (last visited July 28, 2023).

38.     That same year, unwelcome by the NCAA, a group of HBCU leaders created the first Black athletic conference: the Inter-Scholastic Athletic Association of the Middle Atlantic States ("ISSA").[22]

39.     In subsequent years, several additional HBCU athletic conferences emerged, including the Central Intercollegiate Athletic Association ("CIAA," 1912), Southern Intercollegiate Athletic Conference ("SIAC," 1913), Southwestern Athletic Conference ("SWAC," 1920), and Mid-Eastern Athletic Conference ("MEAC," 1970).[23]

40.     Prior to desegregation, many of the country's best Black student-athletes attended HBCUs, which enjoyed national attention for their success on the field or court.

41.     For example, Hall of Fame coach Eddie Robinson started coaching at Grambling State University in 1941, when it was called Louisiana Negro Normal and Industrial Institute.[24] Under his coaching, Grambling won nine Black college football national championships and sent 200 football players to professional teams.

42.     Despite the inherent inequalities brought about by segregation, HBCU football programs thrived in the middle part of the 20th century. Morgan State won four conference titles in seven years from 1943 to 1949, losing only eight games in that span. Southern University won

---

[22] Joseph N. Cooper, J. Kenyatta Cavil, Geremy Cheeks, *The State of Intercollegiate Athletics at Historically Black Colleges and Universities (HBCUs): Past, Present & Persistence,* J. ISSUES IN INTERCOLLEGIATE SPORTS, 2014, No. 7, at 308 (available at http://csri-jiia.org/old/documents/publications/research_articles/2014/JIIA_2014_7_15_307_332_The_Case_of_HBSU.pdf).

[23] Steven J. Gaither, Despite Great Strides, HBCUs and NCAA-Recognized Athletic Conferences Face Challenges, Diverse Issues in Higher Education (Jan. 22, 2013), https://diverseeducation.com/article/50844/.

[24] Shira Springer, *HBCUs and Their Role in Disrupting the College Sports 'Cartel,'* WBUR, Oct. 13, 2017, https://www.wbur.org/onlyagame/2017/10/13/hbcus-grambling-ncaa-cartel.

three conference titles with a 32-0-2 record from 1948 to 1950. Florida A&M lost just four times in 58 games from 1957 to 1962 and produced several AFL and NFL professional athletes.

43.     From 1905 through the 1970s, major NCAA college basketball and football programs were predominantly white; and the southern PWIs were almost exclusively white.[25] During this period when white players predominated collegiate athletics and before all colleges and universities fully complied with desegregation and other civil rights laws, the NCAA's academic standards were either non-existent or very low and Black student-athletes were largely attending HBCUs.

44.     However, as Southern PWIs suffered numerous failed attempts to avoid desegregation in the 1960s and 1970s, coupled with the increasing success of HBCU athletic programs, the economic value of the Black student-athletes' skills and abilities came into sharper focus for the PWIs and they began recruiting Black student-athletes to their institutions.

45.     At the same time, high dollar television contracts were transforming college sports teams into lucrative businesses. Because PWIs were bigger and had more money, they began to siphon the best Black talent from attending HBCUs.

46.     And, despite the success of HBCU athletic teams, mainstream media did not focus on HBCUs, but instead on the PWIs.

47.     PWIs' newfound focus on and interest in recruiting Black student-athletes was based on the commodification of the Black student-athletes' skills and abilities, rather than nurturing each Black student-athlete's whole self, success, and inclusion—the mission of the HBCUs.

---

[25] *See* Delgreco K. Wilson, Black Athletes, Race and the Rise of NCAA Eligibility Requirements, The Black Cager (Sept. 18, 2014),   https://delgrecowilson.com/2014/09/18/black-athletes-race-and-the-rise-of-ncaa-eligibility-requirements/.

48.     In 1984, the Supreme Court ruled in *NCAA v. Bd. of Regents*, 468 U.S. 85 (1984), that schools should be free to pursue their own TV deals. With millions of dollars at stake, television revenue for football and basketball games became the biggest source of revenue for big-time college athletics departments.

49.     By that time, PWIs dominated the recruitment of the top Black student-athletes and thus were able to capitalize on lucrative television deals in the hundreds of millions of dollars, and further expanding the economic divide between PWIs and HBCUs.

50.     Today the conferences referred to as the CIAA, SIAC, SWAC, and MEAC are NCAA-recognized conferences that are still comprised completely or predominantly of HBCUs. SWAC and MEAC play Division I sports. Only two HBCUs—Hampton University and Tennessee State—play in different conferences (Big South and Ohio Valley, respectively). All HBCUs play in the FCS, as opposed to the FBS. None generates the television or sports-related revenue of PWIs.

51.     In comparison, the Power Five generate significant revenue each year, dwarfing that generated by the MEAC and SWAC. The Power Five's financial largesse is due in large part to television contracts tied to their participation in the postseason bowl games and the men's basketball tournament.

52.     As recently as 2010, the NCAA's broadcasting rights for the NCAA men's basketball tournament were worth just under $550 million per year. In 2011, the NCAA reached a new 14-year, $10.8 billion deal that was worth just north of $770 million annually for the NCAA (with a subsequent extension increasing it to $1.1 billion in 2032). At the same time, the

revenue the networks were generating from national TV ad sales during NCAA events more than doubled from $598 million in 2009 to $1.24 billion in 2016.[26]

53.     The television revenue benefits the PWIs and not the HBCUs. For example, in 2018, the conferences in the Power Five reported the following revenue from television contracts, bowl games, and the men's basketball tournament:

|                 |               |
| --------------- | ------------- |
| Big Ten members: | $54 million   |
| SEC members:    | $43.7 million |
| Big 12 members: | $34.7 million |
| ACC members:    | $29.5 million |
| PAC 12 members: | $29.5 million |

54.     That same year, schools in the MEAC and SWAC generated only approximately $1.9 million in revenue from the men's basketball tournament.

55.     In 2014, the NCAA permitted exceptions and carve outs to its rules and policies to the Power Five, permitting them to change and create their own rules in certain areas, including financial aid; awards, benefits, and expenses; and academic support.[27] The Power Five is now also known as the Autonomy Five. The same rules are not granted to SWAC, MEAC, or the other DI conferences or members.

56.     That same year, the Power Five voted to expand the amount of money they could provide to student-athletes in financial support to include incidental expenses such as transportation costs and personal expenses.

---

[26] Cork Gaines and Diana Ykari, *The NCAA Tournament is an enormous cash cow as revenue keeps skyrocketing,* Business Insider, March 17, 2017, https://www.businessinsider.com/ncaa-tournament-makes-a-lot-of-money-2017-3.

[27] Michelle Brutlag Hosick, Board adopts new Division I Structure, NCAA, (August 7, 2014), http://www.ncaa.org/about/resources/media-center/news/board-adopts-new-division-i-structure. *See also* NCAA Bylaws, *supra,* n.12, at 5.3.2.1.2.

57.     The net result is that PWIs' autonomous structure allows them to continue to generate significantly more revenue in sports, which translates to more resources to recruit top athletic talent and provide state-of-the art educational resources and academic support than their HBCU counterparts; and all the while are subjected to different rules, that they created for themselves.

58.     At the same time, Black student-athletes at HBCUs are placed into an overwhelming cycle of NCAA rules and regulations, punishments, and banned postseason play, thereby resulting in rapidly decreasing amounts of already-underfunded resources.

**B.    The NCAA's Academic Performance Program discriminates against HBCUs based on race.**

**1.  The NCAA requires student-athletes to comply with regulations governing all aspects of their lives.**

59.     Once a student-athlete has selected which DI school they will attend, they sign a National Letter of Intent ("NLI")—a valid, binding contract. A student-athlete trades their athletic contributions for an education: he or she agrees to attend a particular NCAA institution full-time as a student-athlete, receiving in return athletics financial aid for a particular number of years and the ability to participate and compete in NCAA athletics.

60.     The NCAA controls the entirety of the NLI program: it hosts the NLI website, prepares the standardized NLI form; dictates when the NLI may be signed and who may be present when it is; determines when the NLI may be released, declared invalid, or voided; establishes an appeal process for NLI releases; requires all members of the NLI program to offer athletics scholarships (which are funded in part or whole by the NCAA and must be consistent

with NCAA rules); and prohibits other institutions from recruiting that student-athlete once the NLI is signed. Following execution, the NLI must be filed with the relevant DI Conference.[28]

61.     Each academic year, student-athletes also sign a Student Athletic Statement (the "Statement"). The Statement is issued and required by the NCAA, and student-athletes must sign it to be eligible to participate in intercollegiate competitions.[29] The Statement references and incorporates the NCAA Division I Manual, which comprises the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively, the "Manual").[30] The Manual sets forth student-athlete obligations and NCAA promises.[31]

62.     Once a student-athlete participates in NCAA sports, they are bound by NCAA bylaws and regulations, including the Manual, which dictate NCAA student-athlete behavior (collectively, with the NLI and Statement, "the Contracts").[32] For example, student-athletes must meet eligibility requirements established by the NCAA, their institution, and the applicable athletic conference (DI Bylaw 20.1.2.4); act with honesty and sportsmanship (DI Bylaw 10.01.1); act ethically (examples of which are provided in DI Bylaw 10.1); comply with drug provisions (DI Bylaw 10.2); not violate the principle of amateurism (DI Bylaw 12.01); comply with recruiting requirements (DI Bylaw 13.01); not receive any "extra benefit" (as defined by the

---

[28] *See, e.g.,* National Letter of Intent, http://www.nationalletter.org; Quick Reference Guide to the NLI, http://www.nationalletter.org/documentLibrary/nli-guide.pdf (last visited July 28, 2023).

[29] NCAA Operating Bylaws, 12.7.2, NCAA Division I Manual 2023-24, *available at* https://web3.ncaa.org/lsdbi/reports/getReport/90008 (last visited Aug. 2, 2023).

[30] *See id.*

[31] *See id.*

[32] *See* NCAA Division I Manual, *supra*, n.7.

NCAA) for their athletic contributions (DI Bylaw 16.01.2); and comply with disciplinary action for failures to comply (DI Bylaw 10.4).[33]

63.     The NCAA dictates how and when student-athletes may use a recruiting agency or professional sports agent, prohibits a student-athlete from receiving compensation from a professional team or promoting a commercial product, and specifies when and how much prize money a student-athlete may receive from a sports competition.[34]

64.     The NCAA has also promulgated academic requirements that dictate when and how a team and its student-athletes may participate in NCAA athletics and postseason play and when and how they may not. Student-athletes are bound by these academic requirements pursuant to the Contracts and relevant NCAA bylaws, regardless of whether they signed those Contracts.

### 2. The NCAA's serial academic requirements have historically discriminated against Black student-athletes at HBCUs.

65.     The NCAA maintains that student-athletes are amateurs, not professionals, and claims that this maintains "a clear line of demarcation between college athletics and professional sports."[35]

66.     Until 1965—the time of desegregation—the NCAA imposed little to no academic requirements on student-athletes at all. Instead, academic eligibility was left to the conferences and member institutions.

---

[33] Citations are to the NCAA Division I Manual 2023-24, *available at* https://web3.ncaa.org/lsdbi/reports/getReport/90008 (last visited Aug. 2, 2023). *See also* NCAA, *Summary of NCAA Regulations—Division I*, Academic Year 2023-24 https://ncaaorg.s3.amazonaws.com/compliance/d1/2023-24/2023-24D1Comp_SummaryofNCAARegulations.pdf (last visited Aug. 2, 2023).

[34] Amateurism, NCAA, http://www.ncaa.org/student-athletes/future/amateurism (last visited July 28, 2023).

[35] NCAA Operating Bylaws, 12.01.2, NCAA Division I Manual 2023-24, *available at* https://web3.ncaa.org/lsdbi/reports/getReport/90008 (last visited Aug. 2, 2023).

67.     In 1965—during a tumultuous time in our country's civil rights battle for equal housing, voting, public accommodations, and education—the NCAA established an academic requirement for the first time. The requirement was known as the "1.6" rule, which determined a student-athlete's initial eligibility (*i.e.* freshman eligibility) by using a combination of GPA and SAT scores to predict the first year GPA, which was required to meet or exceed 1.6.[36]

68.     In 1973, the NCAA abandoned the "1.6 rule" and required that student-athletes have a 2.0 high school GPA to be first-year eligible.[37] But Division I student-athletes exhibited poor academic performance and there were several high-profile admissions and academic fraud scandals. A study performed in the early 1980s indicated that over one-third of the DI basketball programs had graduation rates below 20%, and similar numbers were exhibited in the football programs.[38]

69.     There was also significant criticism that Black student-athletes were being exploited for their athletic abilities, but seriously underserved in the classroom.[39]

70.     In 1983, the NCAA once again changed course and enacted an initial eligibility rule known as Proposition 48.[40]   Reportedly, this change was an attempt to "bolster sagging student-athlete academic performance."[41]

---

[36] *See* Michael J. Mondello, *An Historical Overview of Student-Athlete Academic Eligibility and the Future Implications of Cureton v. NCAA*, 7 JEFFREY S. MOORAD SPORTS L.J. 127, 130 (2000) (available at https://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?article=1189&context=mslj).

[37] *See* Douglas Lederman, College Athletes Graduate at Higher Rate Than Other Students, But Men's Basketball Players Lag Far Behind, a Survey Finds, CHRON. OF HIGHER EDUC., Mar. 27, 1991, at A1.

[38] *See* Mondello, *supra*, n.37 (citing Lederman, *supra*, n.38).

[39] Mondello, *supra*, n.37, at 129; *see also Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992) (former basketball player sues university for failure to educate him, noting he had overall language skills of a fourth grader and seventh grade reading skills when he completed his athletic eligibility).

[40] Gary Brown, NCAA Graduation Rates: A Quarter-Century of Tracking Academic Success, NCAA, Oct. 24, 2014, http://www.ncaa.org/about/resources/research/ncaa-graduation-rates-quarter-century-tracking-academic-success.

71.     Proposition 48 required that incoming student-athletes have a high school GPA of 2.0 in eleven core (required) courses and an SAT score of 700+ (or 15+ on the ACT).[42] The rule allowed "partial qualifier" status for students who met the 2.0 GPA minimum but failed to satisfy the standardized test score: they could receive their athletic scholarship for one year but would be athletically ineligible and therefore lose one year of athletic participation.

72.     The NCAA explained its intent as twofold: to increase graduation rates of men's football and basketball players, and to ensure schools were not counseling players into courses "primarily designed to safeguard their eligibility with little or no concern for their progress toward graduation."[43]

73.     At the time, there was significant data and numerous vocal objections indicating that Proposition 48 would have a disparate impact on Black student-athletes.[44] Although the rule theoretically pressured high schools to better prepare student-athletes for the rigors of the college classrooms, critics asserted that the use of standardized test scores meant the rule was inherently biased, and one HBCU president called it "patently racist."[45]

74.     Even the president of the College Board, which created and administers the SAT, stated that the use of SAT scores in Proposition 48 rendered the rule "patently discriminatory and racist in its effects. Its use is a disservice to minority athletes."[46]

---

[41] *Id.*

[42] Brown, *supra*, n.41.

[43] Mondello, *supra*, n.37, at 131 (citing Letter from Robert H. Atwell, Vice President of ACE on behalf of the President's Committee on Collegiate Athletics, to Chief Executive Officers of ACE Member Institutions 4 (Dec. 22, 1982)).

[44] *See* Mondello, *supra*, n.37.

[45] *Id.* at 133.

[46] *Id.* at 134 (citing Harold J. Vanderzwaag, *Athletics: Academic Standards for Freshman eligibility*, POL'Y DEV. IN SPORT MGMT., 1998, at 49).

75.     Notwithstanding the data and allegations of systemic discrimination, Proposition 48 became effective in 1986.[47]

76.     The NCAA's own subsequent study confirmed that Proposition 48 had a disproportionate impact on Black student-athletes.[48] The study showed that, in 1988, over 80% of ineligible student-athletes were Black.[49]

77.     The data suggested that "a disproportionate number of Black student-athletes were kept on a non-graduation track, so by the time their eligibility expired, they seemed so far from graduating that they may have chosen to drop out because of lack of hope."[50]

78.     In 1990, the NCAA introduced yet another reform called Proposition 42 that removed any type of financial aid for student-athletes who did not meet the academic standards of Proposition 48. Proposition 42 was written and sponsored by the Southeastern Conference ("SEC")—the last major conference to desegregate and allow Black participation.[51]

79.     In 1992, the NCAA again adopted an "academic reform package" designated as Proposition 16, which added two additional core courses and established benchmarks as a

---

[47] Brown, *supra*, n.41.

[48] Todd A. Petr and John J. McArdle, *Academic Research and Reform: A History of the Empirical Basis for NCAA Academic Policy.* J. OF INTERCOLLEGIATE SPORT, 2012, No.5, 27-40 (available at https://www.ncaa.org/sites/default/files/2018RES_05_petr_JIS_0011_27-40_20180522.pdf).

[49] Associated Press, *Blacks Hit Hard by Proposition 48, Survey Shows.* The New York Times Sept. 9, 1988, A25 (available at https://www.nytimes.com/1988/09/09/sports/blacks-hit-hard-by-proposition-48-survey-shows.html).

[50] Douglas Lederman, *NCAA Study Compares Records of Black, White Athletes,* CHRON. OF HIGHER EDUC., July 10, 1991, at A30 (available at https://www.chronicle.com/article/ncaa-study-compares-records-of-black-white-athletes/?cid2=gen_login_refresh&cid=gen_sign_in).

[51] *See* Wilson, *supra*, n.29.

minimum 2.5 GPA (in 13 core courses) and a minimum SAT score of 820, with certain exceptions.[52]

80.     But only half of Black college-bound high school seniors in 1992 met Proposition 16 requirements, compared to more than two-thirds of white students—an even greater disparity than experienced under Proposition 48.[53]

81.     In 1995, 2003, and 2012, the NCAA imposed additional and increasingly stricter reforms to the number of required core courses and sliding scales. For example, for each ten-point drop in SAT scores, the student-athlete had to have a corresponding .025 increase in GPA.[54]

82.     In 1997, more than 19% of Black student-athletes seeking DI initial eligibility were ineligible under Proposition 16, as compared to only 3.1% of white student-athletes.[55]

83.     In a 1998 memorandum, the NCAA conceded that:

> the setting of *any* initial-eligibility standard leads to an essential tension between two conflicting goals: (1) raising of graduation rates, and (2) allowing more individuals access to the finite number of athletics opportunities available. …This tension is heightened by the fact that a disproportionate number of ethnic minorities are affected adversely by the imposition of these rules."[56]

---

[52] Mondello, *supra*, n.37, at 135-136.

[53] *Id.* at 137-38 (citing Nat'l Ctr. For Educ. Stat., *Who can Play? An Examination of NCAA's Proposition 16*, CHRON. OF HIGHER EDUC., July 7, 1995*)*.

[54] Wilson, *supra*, n.29.

[55] NCAA, Memorandum from NCAA Division I Academics/Eligibility/Compliance/Cabinet Subcommittee on Initial-Eligibility Issues to Chief Executive Officers, Faculty Athletics Representatives, Directors of Athletics, Senior Woman Administrators, and Compliance Coordinators of NCAA Division I Institutions, July 27, 1998 (including attachments).

[56] *Id.* at Initial-Eligibility Standards attachment, page 3.

84.     The NCAA further admitted: "African-American and low-income student-athletes have been disproportionately impacted by Proposition 16 standards."[57]

85.     Notwithstanding this clear knowledge and admission that Black student-athletes would be negatively affected, the NCAA made no changes to either Proposition 16 or its subsequent, increasingly strict reforms.

### 3. The NCAA discriminated against Black Student-Athletes at HBCUs when it considered race in the design and implementation of the APP.

86.     The writing on the wall, the NCAA once again returned to the academic reform table and created the APP. The proverbial goal posts were moved yet again.

87.     The 2004 APP marked the first time that the NCAA subjected *teams* to sanctions for academic eligibility: previously, its academic requirements penalized and applied only to individual student-athletes.

88.     The APP's penalty structure includes a progressive, three-level penalty scheme and a separate postseason access penalty. A level one penalty restricts a team's practice time, level two results in a reduction of the season or contests, and level three provides a menu of potential penalties that may be imposed, including financial aid penalties and multiyear postseason competition bans.[58]

89.     The APP penalty structure also restricts postseason access, which encompasses all postseason events conducted after the last regular-season contest or end-of-conference

---

[57] *Id.* at Initial-Eligibility Model I attachment, page 2.

[58] NCAA, NCAA DIVISION I ACADEMIC PERFORMANCE PROGRAM MANUAL, eff. June 1, 2014, at 97-98, 137, available at
https://ulm_ftp.sidearmsports.com/custompages/www.ulmathletics.com/fls/19000/compliance/NCAA_APP_Manual.pdf (last accessed Aug. 2, 2023).

tournament, including NCAA championships, football bowl games, and the men's and women's basketball tournaments.

90.     The APP is complex, as evidenced by its 246-page manual. Its stated purpose is:

> to ensure that the membership is dedicated to providing student-athletes with an exemplary educational and intercollegiate athletics experience in an environment that recognizes and supports the primacy of the academic mission of its member institutions, while enhancing the ability of student-athletes to earn a degree.
>
> The membership is committed to providing higher education for a diverse body of student-athletes within the context of an institution's academic and admissions standards for all student-athletes through a system that rewards those institutions and teams that demonstrate commitment toward the academic progress, retention and graduation of student-athletes and penalizes those that do not.[59]

91.     The key components of the APP are two metrics: the Academic Progress Rate ("APR") and the Graduation Success Rate ("GSR"). The GSR is the NCAA's calculation of student graduation rates, including transfer students. The APR is a team-based measurement of eligibility, retention, and graduation.

92.     Each student-athlete on a team who receives athletically related financial aid earns one point for continuing enrollment as a full-time student and one point for remaining academically eligible pursuant to NCAA guidelines. The team's total points are divided by points possible and multiplied by 1000, resulting in the APR.

93.     As explained by the NCAA's Principal Research Scientist, the Graduation Success Rate is supposed to be a "long term" assessment of student-athlete academic success, while the Academic Progress Rate is a "real-time" assessment of team academic progress. The

---

[59] *Id.* at 1. *See also* NCAA Division I Bylaws, *supra*, n.12, 14.8.

NCAA also represents that a 930 APR is a "proxy" for eventual graduation success, representing a projected 50% GSR.[60]

94.     The NCAA says that, with the APP, it sought to "create a system that will produce improved graduation performance, particularly in specific high-profile sports [football and men's basketball] without having a disparate impact on ethnic minorities."[61]

95.     While announcing the APP's creation in 2004, NCAA President Brand explicitly stated that the program was designed to respond to the allegations of discrimination against Black student-athletes.

96.     The APP has yielded the very results the NCAA stated it intended to correct and avoid. The formula on which the APP was based included metrics that the NCAA knew would directly and negatively affect Black student-athletes. The NCAA had clear knowledge, purpose, and intent to address the racial disparities through the newly reformed APP, fully recognized that the APP continued to perpetuate the disparities and implemented it anyway.

97.     For example, in the 1998-1999 school year, the GSR for Black student-athletes was 59%, as compared to 82% for white student-athletes.[62]

98.     The NCAA knew that GSRs for Black student-athletes were 20-30 percentage points lower than for white student-athletes.[63]

_____

[60] *See* Thomas Paskus, *A Summary and Commentary on the Quantitative Results of Current NCAA Academic Reforms,* J. OF INTERCOLLEGIATE SPORT, 2012, No. 5, 41-53 (available at https://www.ncaa.org/sites/default/files/2018RES_05_petr_JIS_0011_27-40_20180522.pdf).

[61] Walter Harrison, *NCAA Academic Performance Program (APP): Future Directions,* J. OF INTERCOLLEGIATE SPORT, 2012, No.5, at 66.

[62] NCAA, *Division I Freshman-Cohort Graduation Rates 1998-1999*, NCAA, http://web1.ncaa.org/app_data/instAggr2005/1_0.pdf (last visited December 2, 2020).

[63] *Id.*

99.     Nonetheless, the NCAA deliberately chose to rely upon the GSR in determining APR and administering the APP, even though there was little to no correlation between GSR and the measurement of a particular student's academic success.

100.    The NCAA had access to multiple years of data before and after the enactment of the APP that confirmed the GSRs disparate impact on Black student-athletes.

101.    For example, the following NCAA-created chart depicts year-by-year GSR rates for white and Black student-athletes in NCAA men's basketball, both pre- and post-dating the APP:[64]



102.    In another example, the following NCAA-created chart depicts year-by-year GSR rates for white and Black players in NCAA football:[65]

[64] NCAA Research, *Trends in Graduation-Success Rates and Federal Graduation Rates at NCAA Division I Institutions,* October 16, 2013, http://web1.ncaa.org/app_data/GSR/qaahad13/GSR_Fed_Trends_2013_Final.pdf.

[65] *Id.*



103.    To establish the APR, the NCAA decided to collect two years of academic data before determining the "cut" APR at which teams would be rewarded or penalized.[66]

104.    The NCAA contemporaneously established the Division I Committee on Academic Performance, which it tasked with overseeing the APR.[67]

105.    In 2005, the APR was initially and arbitrarily set at 925; it was again arbitrarily reduced to 900 a year later in 2006.[68]

106.    The NCAA implemented a new penalty structure for the APP program in 2011. The APR cut score—required for teams to participate in any NCAA-sponsored championship game, football bowl game, or the basketball tournament—was increased from 900 to 930. For access to postseason competition in 2012-13 and 2013-14, teams were required to achieve a 900

---

[66] NCAA, Academic Progress Rate Timeline, NCAA, http://www.ncaa.org/about/resources/research/academic-progress-rate-timeline (last visited November 22, 2020).

[67] Id.

[68] Id.

multiyear APR or a 930 average over the most recent two years to be eligible. A new penalty structure was also approved for implementation in 2014-15 that would require teams to earn at least a 930 four-year, rolling APR in order to participate in postseason competition.

107.    Walter Harrison, the Chair of the NCAA's Committee on Academic Performance, admitted that at the time the 2011 APP changes were implemented, the NCAA knew (and possessed data confirming) that the revised program would more heavily impact low-resource institutions ("LRIs") and HBCUs, than PWIs.[69] Nonetheless, the Board approved the program as proposed, creating the current penalty structure.

108.    Importantly, because the NCAA knew that its new penalties would have a direct impact on Black student-athletes at HBCUs, the NCAA Committee on Academic Performance recommended the Board establish an HBCU Academic Advisory group to "assist on issues that impact HBCU institutions" and serve in an advisory capacity to the Committee.[70] It stated:

> *An in-depth examination of APR trends indicates that a higher proportion of HBCU teams have been subject to APP penalties.* The NCAA staff has begun several initiatives to assist HBCU institutions and to provide additional services to meet the NCAA and the institution's objectives. The formation of this advisory group would represent a collaborative and proactive effort between HBCU institutions and the NCAA to serve as a conduit to communicate issues and concerns that may impact HBCUs collectively within the Academic Performance Program. HBCU institutions have played an important role in helping shape the traditions and public impression of the NCAA. Therefore, it is of utmost importance to find ways to assist HBCUs as members of Division I.[71]

---

[69] Harrison, *supra*, n.62, at 71.

[70] NCAA Division I Committee on Academic Performance, Report of the NCAA Division I Committee on Academic Performance October 24-25, 2011, Meeting.

[71] *Id.* at 11 (emphasis added).

109.    The Board established the Historically Black Colleges and Universities and Low Resource Institution Academic Advisory Group ("HBCU-LRI Academic Advisory Group"). But the HBCU-LRI Academic Advisory Group was simply window-dressing. It was marginalized almost immediately and its recommendations--including that more funding be provided to HBCUs to support academic resource centers and that HBCUs and LRIs be provided a three-year transition period to comply with and be subject to the APP were largely rejected.[72]

110.    In a 2012 article, Thomas Paskus, the NCAA's Principal Research Scientist, wrote that:

> [a] salient concern for CAP [Committee on Academic Progress] is APR trending at Historically Black Colleges and Universities (HBCUs), some of which have not shown improvement and in some cases have actually regressed in their APRs. Various factors have been cited and discussed by CAP including resource, support services, admissions profiles, mission, contest scheduling, high rates of administrative turnover, and early exemption from APR penalties.[73]

111.    He further observed: "[a]cademic difficulties are multidimensional and cluster within certain sports or schools in a way that probably should lead to further discussion of tailored approaches to PTD [progress-toward degree]."[74]

112.    But rather than proposing a real solution—*i.e.,* developing a non-discriminatory program—Paskus instead suggested that schools consider "capping" the number of "high-risk

---

[72] Kevin Trahan, *The NCAA's Academic Progress Rate Punishes HBCUs More Than it Promotes Education,* Vice, April 29, 2016, https://www.vice.com/en/article/qky8qw/ncaa-apr-punishes-hbcus-more-than-it-promotes-education; *TSU President Dr. John Rudley Leading NCAA Committee,* Diverse Issues in Higher Education, February 28, 2013, https://diverseeducation.com/article/51633/; *see also* Allie Grasgreen, *Uphill Battle for HBCU Athletes,* Inside Higher Ed, June 17, 2013, https://www.insidehighered.com/news/2013/06/17/hbcus-get-some-help-still-struggle-meet-ncaa-academic-standards.

[73] Paskus, *supra,* n.61 at 43.

[74] *Id.* at 45.

student-athletes admitted at any given time."[75] However, this proposed approach wholly contradicts the HBCU mission of providing education to low-income, first generation, and historically disadvantaged Black students.

113.    In 2013, Dr. John Rudley, then-president of HBCU Texas Southern University, former chairman of the SWAC Council of Presidents and Chancellors, and then-leader of the HBCU-LRI Academic Advisory Group, observed that:

> [within the NCAA,] the voices of the larger schools, the Bowl Championship Series Schools, the wealthier schools, seem to carry more weight than those of us designated as HBCUs… Our challenge, as we see it, is to express to the NCAA that one size does not fit all. *We contend that the NCAA APR standard conflicts with the mission of our universities. We emphatically state that we are fulfilling our mission.*[76]

114.    That same year, more than 80% of the teams that received postseason bans were from HBCUs. Walter Harrison admitted that the NCAA's financial support for HBCUs was "certainly… not adequate."[77]

115.    A 2013 study in the Journal of Intercollegiate Sport compared APR trends among LRIs, HBCUs, and other institutions.[78] It revealed that HBCUs continued to trend well below PWIs in terms of APR, eligibility, retention, the number of student-athletes who left school academically ineligible, and the percentage of teams with a less than 930 APR.

116.    For example, in 2010-2011, 33% of HBCU teams had APRs less than 930, compared to 7% of non-low-resource DI PWIs.

---

[75] *Id.* at 52.

[76] Grasgreen, *supra*, n.73 (emphasis added).

[77] *Id.*

[78] Melvin Norman Thomas. *Financial and Related Issues at HBCUs.* J. OF INTERCOLLEGIATE SPORT, 2013, No. 6, 65-75 (available at https://core.ac.uk/download/pdf/200288469.pdf).

117.    A 2015 Washington Post article, published after the NCAA revealed that 15 of 21 teams receiving postseason bans that year were from HBCUs, asked: "Does the NCAA unfairly punish sports programs at historically black schools?"[79]

118.    In addressing the obvious and significant APR gap between HBCUs and other DI schools, the article noted that "[m]any HBCUs face the challenge of serving their core mission of educating poor and academically underserved communities with less funding than more powerful programs to provide academic oversight geared at keeping athletes eligible." And it quoted Roderick McDavis, then-current chair of the NCAA Committee on Academics, as saying (of the HBCU APR gap): "I won't say it's giving me nightmares. I'm very concerned about it."[80]

119.    In fact, critics have doubted whether the APR really has anything to do with the quality of education, instead likening it to a "game" more easily manipulated by high-resource DI schools than by HBCUs.[81]

120.    There is substantial doubt that the NCAA's repeated academic reform efforts have anything to do with an accurate measure of the quality of a student-athlete's education. For example, a recent published study, "Degree Attainment for Black Students at HBCUs and PWIs: A Propensity Score Matching Approach," measured how attending an HBCU impacts chances to persist and graduate when compared to PWIs. The study determined that HBCUs significantly

---

[79] Isabelle Khurshudyan, *Does NCAA unfairly punish sports programs at historically black schools?* WASH. POST, July 7, 2015, https://www.washingtonpost.com/sports/colleges/hbcus-struggle-with-apr-standards-but-some-say-ncaa-measure-fails-them/2015/07/07/30d88b62-20de-11e5-bf41-c23f5d3face1_story.html.

[80] *Id.*

[81] Id.

outperform PWIs.[82] Specifically, the study concluded that the average treatment effect of attending an HBCU to be within 6.0% to 16.1%, "indicating significantly higher chances of success for Black students at these institutions."[83]

121.    As the co-author of the study and senior director at the Education Trust stated, Black colleges are "very different" than most predominantly white institutions. "When you actually compare HBCUs to similar PWIs that enroll comparable percentages of low-income students, our research suggests that HBCUs tend to have higher completion rates for black students."[84]

122.    Critiques of the APP program and its effect on Black student-athletes at HBCUs are published every spring when new APP penalties are announced that again disproportionately affect HBCUs.

123.    A 2016 Vice article asserted that the APR measures athletic eligibility, not actual learning, and therefore punishes Black student-athletes at HBCUs, which do not have the resources to capitalize on the APR's weaknesses.[85] It aptly noted: "[t]he NCAA can plainly see that the APR disproportionately hurts HBCUs and their athletes, and yet it keeps it regardless."[86]

124.    A 2017 article in Andscape characterized that year's postseason bans, again primarily affecting Black student-athletes at HBCUs, as "polite racism."[87] And in 2020, it

---

[82] Julian Wyllie, *How Are Black Colleges Doing? Better Than You Think, Study Finds*, The Chronicle of Higher Education, April 13, 2018, https://www.chronicle.com/article/how-are-black-colleges-doing-better-than-you-think-study-finds/.

[83] *Id.*

[84] *Id.*

[85] Trahan, *supra*, n. 73.

[86] *Id.*

[87] Derrick Z. Jackson, *NCAA ban of 15 HBCU teams from postseason play is polite racism*, Andscape, May 31, 2017, https://andscape.com/features/ncaa-ban-15-hbcu-teams-postseason-play-is-polite-racism/.

declared that the "NCAA must stop perpetuating academic and financial disparities for HBCUs."[88]

125.   Although the NCAA claims to have made numerous "reforms" to its academic measurements throughout several decades, it is an intentional decision to consistently acknowledge reliable data that its "reforms" hobble and undermine the path of the Black student-athlete at HBCUs but nonetheless allow the discrimination to continue.

126.   The APP—the NCAA's latest flavor of the month—persists in disregarding these issues. And while the NCAA continues to penalize Black student-athletes at HBCUs for low APRs and GSRs, it both acknowledges and ignores egregious disparities between the graduation rates of Black and white student-athletes in NCAA teams with "passing" APRs at PWIs.

127.   For example, a 2016 article reported that, in the FCS and among FBS power schools like Iowa, Michigan State, North Carolina, Texas, California, and Southern California, GSRs for Black student-athletes range from 43-48% while GSRs for white student-athletes are between 73- 94%.[89]

128.   The disparity is even worse in men's basketball, where Illinois, Michigan State, Oklahoma State, Texas Christian, Washington State, LSU, Mississippi State, Texas A&M, Central Florida, Texas-San Antonio, Ohio, Fresno State, Hawaii, and Wyoming have a 100% GSR for white players but a GSR less than 50% for Black student-athletes.[90] But because these

---

[88] Derrick Z. Jackson, *NCAA must stop perpetuating academic and financial disparities for HBCUs*, Andscape, May 27, 2020, https://andscape.com/features/ncaa-must-stop-perpetuating-academic-and-financial-disparities-for-hbcus/.

[89] Derrick Z. Jackson, HBCUs unfairly penalized by NCAA academic and graduation standards, Andscape, September 13, 2016, https://andscape.com/features/hbcus-unfairly-penalized-by-ncaa-academic-and-graduation-standards/.

[90] *Id.*

teams post overall GSR rates within NCAA parameters via the APR scores, they are not penalized.

129.    Thus, the Black student-athlete's individual academic success is truly irrelevant to the NCAA, as long as there are sufficient numbers to dilute and mask the Black student-athlete's academic struggles at a PWI. Indeed, this dilution of Black student-athletes is commonplace at PWIs.

### 4. An HBCU team is 43 times more likely to receive a postseason ban than a PWI team.

130.    APP penalties, including postseason bans, have been disproportionately levied against HBCUs for more than a decade.

131.    Only 6.5% of DI schools are HBCUs (23 out of 350). But 72% of the 159 teams that have been banned from postseason competition since 2010 are from HBCUs (114 of 159).

132.    Moreover, 62% of the teams banned from postseason competition come from the SWAC and MEAC, the two historically Black conferences.

133.    An HBCU team is **43 times** more likely to receive a postseason ban than a PWI team.

134.    Only one Power Five team has ever received a postseason access penalty.

135.    The following chart depicts the number of HBCU teams banned from postseason play under the APP since 2010[91]:

| Year | Number of HBCU Teams Receiving Postseason Bans | Total Number of Teams Receiving Postseason Bans | Percentage of Banned Teams that Were from HBCUs |
|---|---|---|---|
| 2010-2011 | 5 | 14 | 36% |
| 2011-2012 | 10 | 13 | 77% |

[91] Source: https://web3.ncaa.org/aprsearch/aprsearch (last visited July 30, 2023).

| Year | Number of HBCU Teams Receiving Postseason Bans | Total Number of Teams Receiving Postseason Bans | Percentage of Banned Teams that Were from HBCUs |
|---|---|---|---|
| 2012-2013 | 23 | 42 | 55% |
| 2013-2014 | 17 | 21 | 81% |
| 2014-2015 | 21 | 22 | 95% |
| 2015-2016 | 14 | 16 | 88% |
| 2016-2017 | 7 | 8 | 88% |
| 2017-2018 | 6 | 8 | 75% |
| 2018-2019 | 11 | 15 | 73% |
| 2019-2020 | 6 | 8 | 75% |
| 2020-2021 | 11 | 15 | 73% |

136.    While the NCAA frequently lumps HBCUs with low-resource institutions and directs its aid to LRIs, research has demonstrated that lower resources alone cannot account for the disparity in HBCU APRs and GSRs.

137.    A 2018 study evaluated which factor, race or low resources, leads to greater APP penalties.[92]

138.    The study compared HBCUs to similarly resourced non-HBCUs (thus controlling for resources), analyzed NCAA and Knight Commission academics and athletics data, and employed a regression analysis. Ultimately, the study concluded that race—the mere fact that an institution is an HBCU—is a predictor of APP penalties. Resources are not.

139.    According to the study, HBCUs are 6-8 times more likely to be penalized than similarly resourced, non-HBCU institutions.[93]

---

[92] Ryan J.R. Westman, Investigating Equity: An Evaluation of the Relationship of the NCAA's APR Metric on Similarly Resourced Historically Black and Predominately White NCAA Division-I Colleges and Universities (August 23, 2018) Seton Hall University Dissertations and Theses, https://scholarship.shu.edu/cgi/viewcontent.cgi?article=3664&context=dissertations.

140.    In discussing the study post-completion, the author was blunt: "It's a sin that the penalties are so skewed when HBCUs' mission is grounded in access to low-income and first-generation students…. It screams inequity when HBCUs were once so woven into the fabric of American sports…. It's like the system is turning its back on HBCUs when these schools need support."[94]

### 5.   The NCAA uses the APP to reward PWIs.

141.    The NCAA now rewards schools who consistently achieve high APRs. The Public Recognition Program awards the top-performing teams in each sport (top 10%) based on their most recent multiyear APR.[95]

142.    Enacted in 2016 and beginning this year, the NCAA now provides *financial* awards to schools that achieve an APR of 985 or higher in the previous year (averaged across all teams), a GSR of 90% or more the previous year (averaged across all teams), or a graduation rate that is 13 or more points greater than the Federal Graduation Rate.[96]

143.    Projected distributions begin at $111,000 (2020-2021, reduced for COVID-19), and will reach $473,000 in 2025-2026. This money will be distributed without restrictions and will increase annually.

144.    The NCAA projects that 66% of member schools will qualify each year.

---

[93] *Id.*

[94] Derrick Z. Jackson, *NCAA must stop perpetuating academic and financial disparities for HBCUs,* Andscape, May 27, 2020, https://andscape.com/features/ncaa-must-stop-perpetuating-academic-and-financial-disparities-for-hbcus/.

[95] NCAA Division I Academic Performance Program Manual, *supra*, n.59, at 146.

[96] NCAA, Academic Based Revenue Distribution, NCAA, http://www.ncaa.org/academic-based-revenue-distribution (last visited July 30, 2023).

145.    Yet, for academic year 2018-2019, no MEAC or SWAC school has a GSR above 90%.

**C.     Class members have been injured by or are at risk of injury because of the APP.**

**1.    The NCAA's conduct interferes with student-athletes' ability to make and enforce contracts—their Contracts.**

146.    Postseason bans exclude student-athletes from all postseason events conducted after the last regular-season contest or end-of-conference tournament, including NCAA championships, football bowl games, and the men's and women's basketball tournaments.

147.    These competitions are highly televised and provide student-athletes with publicity and exposure amongst their peers, scouts, corporate sponsors, and the public.

148.    The NCAA's postseason bans deny players the opportunity to further compete with their peers; further develop their athletic careers; receive greater media coverage and acclaim; improve and achieve meaningful play-based metrics, which affects subsequent career trajectory; and capture the attention of and access to recruiters and sponsors, including the lucrative post-college benefits they offer. Further, players' confidence in their HBCUs, their teams, and themselves is affected.

149.    The full opportunity to compete also impacts student-athletes' opportunities for careers in coaching and the business of collegiate and professional sports.

150.    Black student-athletes were not provided full information about the potential consequences of the NCAA's discrimination against Black student-athletes at HBCUs. As a result, unbeknownst to them, they entered their Contracts with substantial disadvantages and effects.

151.    In this manner, the NCAA's postseason bans interfere with student-athletes' Contracts. Players are prevented from receiving the full benefits and privileges of their contracts,

including participation in the competitions for which their team's ranking qualifies them. Schools cannot access greater publicity, media coverage, and revenue attendant to highly publicized events, such as championship tournaments.

152.   Student-athletes are less visible to recruiters, reducing their opportunities for professional play. Similarly, career opportunities, such as coaches, trainers, or other sports-related career pathways, are hindered and limited without the full and complete opportunities that postseason play at the Division I level offer.

153.   And these losses ultimately affect institution prestige and recruitment, reducing the pool of potential future team members and staffing, encouraging student-athletes to transfer to non-banned teams, affecting the schools' public standing, disincentivizing student-athletes from attending HBCUs, thereby foregoing the numerous tangible and intangible advantages that HBCUs offer Black students but that PWIs cannot; and thus further limiting the teams' future successes and opportunities for revenue-generation.

### 2.   The NCAA's conduct creates an increased risk that Black student-athletes at Division I HBCUs will suffer irreparable harm.

154.   All current student-athletes at Division I HBCUs are currently at risk of irreparable harm, *i.e.*, racially discriminatory interference with the making and enforcing of valid contracts (NLIs, Statements, the Manual, and mutual agreements to be bound by NCAA Regulations) and conspiracy to deprive them of their rights and privileges, due to the NCAA's enforcement of the APP and disproportionate levying of APR-related penalties upon HBCU teams.

155.   This harm, including lost postseason access, lost opportunities, and lost future revenue and career advancement, cannot be undone, reversed, or adequately remedied by monetary compensation.

156.    Proactive injunctive relief is necessary to eliminate the increased risk and protect current student-athletes at Division I HBCUs. This common risk of irreparable harm is higher than the general societal risk of these harms and is directly traceable to the actions and inactions of Defendant.

## V.    TOLLING OF STATUTE OF LIMITATIONS

157.    The running of any applicable statute of limitations has been tolled by reason of the discovery rule, Defendant's fraudulent concealment, and/or Defendant's continuing violations.

158.    The NCAA's racial discrimination and tortious conduct has been continuous and ongoing since at least the inception of the APP until present. Each act to enforce the APP, penalty, and postseason ban constitute a new injury; a new discriminatory interference with Class members' right to make and enforce contracts; and a new act of fraud.

159.    Black student-athletes did not know, and did not have enough information as laypeople to know, that the administration and enforcement of the APP and their related injuries were a result of intentional discrimination.

160.    Moreover, the NCAA insisted—and continues to insist—that the APP and postseason bans are applied fairly, do not discriminate against Black student-athletes or HBCUs, and are equitable. The NCAA controls the data surrounding APR calculation, the identity of LRIs, and the discriminatory effects of its APP penalties. The NCAA concealed from the Class members these facts and the true, racially discriminatory nature of the APP.

161.    Class members were unaware and could not have reasonably known or learned through reasonable diligence, that the NCAA and its APP discriminated against them.

162.    Moreover, the NCAA's discriminatory acts and decisions—a pattern made over time—made it difficult if not impossible for Plaintiff to determine the actual date of discrimination.

## VI.    CLASS ALLEGATIONS

163.    Plaintiff brings this action on behalf of the following "Injunctive Relief Class" pursuant to Fed. R. Civ. P. 23(b)(2): "All current Black student-athletes participating in Division I HBCU athletic teams during the academic year 2022-23 through the date of class certification."

164.    Excluded from the Class is Defendant and any of its affiliates, parents, subsidiaries, officers, and directors; any entity in which Defendant has a controlling interest; all persons who make a timely election to be excluded from the class; governmental entities; and all judges assigned to hear any aspect of this litigation, including their immediate family members.

165.    Numerosity: There are 23 Division I HBCUs, and thus likely hundreds if not thousands of current Black student-athletes. As such, the members of the Class are so numerous that joinder is impractical.

166.    Typicality: Plaintiff's claims are typical of the claims of other Black student-athletes at Division I HBCUs.

167.    Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests and the interests of all other members of the Class are identical, and Plaintiff is cognizant of her duty and responsibility to the Class. Accordingly, Plaintiff can fairly and adequately represent the interests of the Class. Moreover, Plaintiff's counsel is competent and experienced in litigating class actions, including litigation of this kind. Plaintiff and counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

168.    Commonality: There are numerous questions of law and fact common to the Class, including:

      a.    Whether the NCAA's APP program discriminates against HBCUs and their Black student-athletes;

      b.    Whether that discrimination is intentional and race-based;

      c.    Whether the NCAA's discriminatory acts interfere with the Class's ability to make and enforce contracts;

      d.    Whether the NCAA's conduct has caused members of the Class's injury; and

      e.    The scope of the injunctive relief to which Plaintiff and members of the Class are entitled.

169.    Equitable Relief: Class certification is appropriate under Rule 23(b)(2) because Defendant has acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief is appropriate with respect to the Class as a whole. Such injunctive relief includes, but is not limited to, the implementation of systemic changes to prevent such conduct in the future as mentioned above.

## VII.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF CIVIL RIGHTS
### (42 U.S.C. § 1981)

170.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth in full herein.

171.    Plaintiff brings this claim on behalf of the Injunctive Relief Class.

172.    42 U.S.C. § 1981 ("Section 1981") provides for the equality of United States citizens and prohibits racial discrimination in, among other things, the making and enforcement of contracts. "Making and enforcement of contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

173.    Black people are a protected class under Section 1981.

174.    HBCUs are, by their very definition, Historically Black Colleges and Universities, and their students and student-athletes are predominantly Black. HBCUs were established in the times of slavery and Jim Crow segregation to serve the educational needs of Black people. Today, HBCUs continue "to serve a vital component of American higher education" for Black people.[97]

175.    HBCU DI athletic teams are comprised of primarily Black student-athletes.

176.    Class members are Black student-athletes at Division I HBCUs and have executed Contracts, in the form of National Letters of Intent or Student-Athlete Statements, or have

---

[97] U.S. Dept. Educ., Office of Civil Rights, *supra,* n.13.

otherwise agreed to be bound by the NCAA's Division I rules. These contracts are valid and binding.

177.   The NCAA knows that Class members are Black. The NCAA knows and has always known that HBCUs are Black institutions, which serve a unique, important, and longstanding mission not addressed by PWIs. The HBCU mission is to serve Black students who have been disadvantaged by systemic racism and discrimination and provide an educational environment and experience of inclusion and community—an aspect that many Black student-athletes at PWIs do not receive.

178.   The NCAA's adoption of the APP, including its penalty structure and postseason access bans, as well as the numerous preceding series of NCAA propositions and reforms, represent a pattern or practice of discrimination against Black student-athletes at HBCUs on the basis of race.

179.   The NCAA's continued enforcement of the APP, including its APR, penalty structure, and postseason access bans, is intentionally discriminatory and it was instituted because of race. As such, these acts violate Section 1981's prohibition against purposeful discrimination.

180.   The NCAA adopted and continues to enforce the APP and its postseason ban penalties to deny full participation and full Contracts benefits to Black student-athletes at HBCUs, including the Class. Moreover, Black student-athletes at HBCUs are not able to enjoy all of the benefits, privileges, terms, and conditions of their contractual relationships as compared to similarly situated white student-athletes at PWIs.

181.   The NCAA's academic requirement programs have consistently discriminated against Black student-athletes at HBCUs. The NCAA claims that it created the APP in part to

address the race-based discrimination alleged in previous civil litigation, as well as the low graduation rates of Black student-athletes as compared to white student-athletes. Accordingly, race was a but-for cause of the NCAA's establishment of the APP program.

182.    The NCAA claims that the APP's purpose is to "provid[e] student-athletes with an exemplary educational and intercollegiate athletics experience *in an environment that recognizes and supports the primacy of the academic mission of its member institutions,* while enhancing the ability of student-athletes to earn a degree."[98]

183.    However, the APP does not view HBCUs' academic missions the same as their PWI counterparts' academic missions.

184.    The very foundation of HBCUs is and has always been to provide educational opportunities for the underserved Black community. In the eyes of the NCAA and in its decision-making, development, and implementation of the APP, that core mission is not only devalued, but is a detriment to HBCUs, for which they are penalized.

185.    In short, the NCAA penalizes HBCUs for maintaining institutional missions that are unapologetically targeted towards addressing racial inequities and educating Black students who are also athletes. In contrast, PWIs are rewarded for their predominantly white student-athlete averages, oftentimes without regard to the true academic progress of their Black student-athletes.

186.    If the NCAA truly valued the educational success of its student-athletes and wanted to address the negative impacts of its APP on Black student-athletes, it would compare "apples to apples" and take into account systemic variables such as socioeconomic status,

---

[98] NCAA DIVISION I ACADEMIC PERFORMANCE PROGRAM MANUAL, *supra,* n.59, at 1 (emphasis added).

academic preparation, and other disparities such as generational gaps in college-education and wealth.

187.    HBCUs would be rewarded, rather than penalized, for taking the least advantaged Black student-athlete and providing him with a truly student-centered academic experience. The current NCAA APP system disincentivizes HBCUs from continuing their tradition and missions in exchange for negligible comparative resources. Indeed, the NCAA even suggested that a solution would be to "cap" the number of "high-risk student athletes at any given time." HBCUs are caught in a paradox where their resources are continually limited and reduced by the APP penalties unless they are able to lift themselves up by their proverbial bootstraps.

188.    The NCAA knows that the APP directly conflicts with HBCUs' unique mission— created in response to hundreds of years of slavery, segregation, and discrimination—and yet persists in implementing and enforcing it in a racially-discriminatory manner.

189.    The NCAA's claims that the APP was developed to address the racially discriminatory impact on Black student-athletes at HBCUs are patronizing, at best, pretextual at worst, and discriminatory in violation of Section 1981 either way.

190.    HBCU teams are 43 times more likely than PWI teams to sustain postseason bans. This significant disparity may in and of itself show intentional discrimination, particularly given the increasing, persistent disparities over the years and throughout numerous reform cycles.

191.    In addition to the substantial and significant disparate impact on HBCUs, there are numerous additional pieces of circumstantial evidence of the NCAA's intentional discrimination against Black student-athletes at HBCUs. For example, the historical background of the NCAA's decision-making process regarding its "academic reforms" and the various and multiple versions that ultimately resulted in the APP provide strong evidence of the NCAA's

knowledge, intent, and motive to implement the APP because of race and in violation of Section 1981.

192.    To further cement and secure relegation of Black student-athletes at HBCUs to second class status, the NCAA provided the ultimate PWIs—the Power Five—with autonomy regarding key regulatory areas. Ironically, this very decision now gives the Power Five the ability to operate largely outside of the parameters of the NCAA's substantive and procedural requirements. Black student-athletes at HBCUs, on the other hand, will continue to be subjected to the NCAA's pretextual rules and procedures.

193.    Finally, the NCAA's intentional discrimination is further evidenced by the specific and direct statements and actions or inactions by NCAA's decisionmakers regarding their intentions and knowledge around the APP's purpose, impact, and history with respect to Black student-athletes at HBCUs. Regardless of whether the NCAA attributes its reform efforts to "helping" the Black student-athlete at HBCUs, its patronizing efforts are pretextual and made because of their race.

194.    The NCAA's purposeful discrimination directly and proximately caused Class members to be excluded from postseason access. As a result of the NCAA's continued discriminatory acts, Class members thus have been denied the opportunity to make and perform contracts (the NLIs, Statements, and agreements to be bound by NCAA Regulations) and denied the benefits, privileges, terms, and conditions of that contractual relationship, including:

      a.  the ability to compete with their peers (and the benefits attendant thereto);

      b.  the ability to further develop their athletic and professional careers;

      c.  the ability to receive greater media exposure, coverage, and acclaim;

      d.  participating in the pinnacle of college athletic competition;

    e.   the ability to improve and achieve meaningful play-based metrics, which affects subsequent career trajectory; and

    f.   the ability to garner the attention of and access to recruiters and sponsors, including the lucrative post-college benefits they offer.

195.　In fact, Class members' ability to enjoy the full, intended benefits of their Contracts is contingent upon their team's APR and the penalties the NCAA elects to consistently levy against their HBCU team—neither of which the Black student-athlete knows at the time of contracting or can otherwise control. And because the APP uses a four-year rolling average in its calculation, student-athletes are impacted by conduct occurring before they even matriculated from high school.

196.　But for the NCAA's purposeful discrimination, the Class members would have received the full, intended benefits of their Contracts. But for their race, they would not have suffered the loss of their legally protected right to make and enforce contracts and to enjoy the benefits of those contracts.

197.　As a result of Defendant's actions, Plaintiff and Class members have suffered and will continue to suffer injury absent injunctive relief.

198.　Accordingly, Plaintiff seeks injunctive relief to prevent the implementation or enforcement of the APP and equitable relief in the form of a monitor to ensure that future academic benchmarks, used by the NCAA to reward or penalize student-athletes or teams, do not discriminate against Black student-athletes at HBCUs.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS**
**(42 U.S.C. § 1985(3))**

199.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth in full herein.

200.    Plaintiff brings this Count II on behalf of the Injunctive Relief Class.

201.    Defendant conspired for the purpose of depriving, either directly or indirectly, Black student-athletes at HBCUs from seeking the equal protection of the laws and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States and the various states of the United States, including, but not limited to, their rights to freedom of movement and travel, association and assembly, and right to contract; and their rights not to be enslaved nor deprived of life and liberty other than by due process of law.

202.    Defendant intentionally discriminated against Black student-athletes at HBCUs to deprive them of the equal protection of, or equal privileges and immunities under, the law.

203.    Class members were deprived of due process when they were banned from postseason play through the NCAA's discriminatory creation and implementation of its APP, including its postseason access ban against teams, unrelated to the individual Black student-athlete's circumstances.

204.    Class members were deprived of their right to appeal their individual grievances as they had no knowledge of the impending team-wide penalties and bans when they signed their Contracts.

205.    Class members were required to continue to stay, perform, and play for their NCAA banned schools under altered terms or lose educational scholarships, suffer potential further penalties regarding eligibility upon transfer to another school, and/or forego the freedom to attend an HBCU with all of its attendant advantages.

206.    Class members executed Contracts based on limited information that the Defendants should have disclosed and that they knew would impact Black student-athletes' decisions regarding their Contracts.

207.    Defendant has conducted multiple and serial acts in furtherance of its conspiracy to deprive Black student-athletes at HBCUs through the creation and implementation of the APP and its attendant and repeated penalties against Black student-athletes at HBCUs. For example, over several decades and since the beginning of the NCAA's introduction of its academic reform measures, Black student-athletes at HBCUs have been banned from postseason play and subjected to multiple penalties.

208.    Defendant's actions were done with invidious discriminatory animus against Black people and were effectuated through the implementation and imposition of programs that discriminated against Black student-athletes at HBCUs.

209.    As a result of Defendant's actions, Plaintiff and Class members have suffered and will continue to suffer injury absent injunctive relief.

210.    Accordingly, Plaintiff seeks injunctive relief to prevent the implementation or enforcement of the APP and equitable relief in the form of a monitor to ensure that future academic benchmarks used by the NCAA to reward or penalize student-athletes or teams do not discriminate against Black student-athletes at HBCUs.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Injunctive Relief Class, respectfully requests that the Court enter a judgment on their behalf and against the NCAA, and further grant the following relief:

A.      Certify the proposed Injunctive Relief Class pursuant to the Federal Rules of Civil Procedure Rule 23(a) and (b)(2);

B.      Designate Plaintiff as representative of the proposed Injunctive Relief Class, and Plaintiff's counsel as Class counsel;

C.      Award injunctive relief and equitable relief as may be appropriate to enjoin and prevent further discrimination;

D.      Award Plaintiff and the Class members' attorneys' fees and costs; and

F.      Award to the Plaintiff and Class members such other and further relief as the Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff, individually and on behalf of the proposed Class, respectfully requests a trial by jury as to all matters so triable.

Dated: August 4, 2023                      Respectfully submitted,

/s/ William N. Riley
William N. Riley (Atty. No. 14941-49)
Russell B. Cate (Atty. No. 27056-29)
Sundeep Singh (Atty. No. 36591-29)
**RILEYCATE, LLC**
11 Municipal Drive, Suite 320
Fishers, IN 46038
Telephone: (317) 588-2866
Facsimile: (317) 458-1875
wriley@rileycate.com
rcate@rileycate.com

48

ssingh@rileycate.com

Elizabeth A. Fegan (to be admitted *pro hac vice*)
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100
beth@feganscott.com

Melissa R. Clark (to be admitted *pro hac vice*)
**FEGAN SCOTT LLC**
140 Broadway, 46th Fl.
New York, NY 10005
Telephone: (347) 353-1150
Facsimile: (312) 264-0100
melissa@feganscott.com

Ling S. Wang (to be admitted *pro hac vice*)
**FEGAN SCOTT LLC**
121 N. Washington Ave., 4th Fl.
Minneapolis, MN 55401
Telephone: (651) 432-4468
Facsimile: (312) 264-0100
ling@feganscott.com

LaRuby May (to be admitted *pro hac vice*)
Je Yon Jung (to be admitted *pro hac vice*)
Jessica H. Meeder (to be admitted *pro hac vice*)
**MAY JUNG, LLP**
333 City Blvd. West
Suite 327
Orange, CA 92868
Telephone: (818) 869-6476
Facsimile: (202) 618-8282
jeyon@mayjung.com
laruby@mayjung.com
jessica@mayjung.com

*Attorneys for Plaintiff and the Proposed Class*