UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRENDA MCKINNEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  Case No. 1:23-cv-01372-TWP-MJD |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) ) |
| Defendant. | ) ) |

**ORDER ON DEFENDANT'S MOTION TO DISMISS AND
MOTION TO STRIKE PLAINTIFF'S RESPONSE**

This matter is before the Court on Defendant National Collegiate Athletic Association's ("NCAA") Motion to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) (Filing No. 15), and Motion to Strike Plaintiff's Response to Defendant's Supplement to the Motion to Dismiss (the "Motion to Strike") (Filing No. 102). Plaintiff Brenda McKinney ("McKinney") is a former basketball player at Grambling State University, a Division I Historically Black College or University ("HBCU"). McKinney filed this Class Action Complaint challenging the NCAA's Academic Performance Program ("APP"), which applies to Division I schools and imposes penalties, including bans from post-season play, on student-athletes and teams for failing to meet certain thresholds for academic performance. She alleges that the Academic Performance Program intentionally discriminates against Black student-athletes and HBCUs in violation of 42 U.S.C. §§ 1981 and 1985. For the following reasons, the NCAA's Motion to Dismiss and Motion to Strike are **granted** but McKinney is granted leave to amend her Complaint.

I. **BACKGROUND**

A. **Factual Allegations**[1]

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the Complaint and draws all inferences in favor of McKinney as the non-moving party. *See Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

1. **The Parties**

McKinney is a former student of Grambling State University ("Grambling"), a Division I HBCU ([Filing No. 1] ¶ 16). When she filed her Complaint, she was a member of the Grambling women's basketball team and intended to play basketball during the 2023–2024 and 2024–2025 academic years. *Id*.

The NCAA is an unincorporated association that acts as the governing body of college sports, and its constitution, bylaws, and regulations dictate rules of conduct, ethics, and eligibility for member institutions and student-athletes. *Id.* ¶¶ 17–18. Since 1973, the NCAA's member schools have been organized into three divisions, each of which has its own rules and guidelines governing athletics. *Id.* ¶ 20. The most prestigious division, Division I ("D1"), is made up of approximately 350 of the NCAA's 1,200 member schools. *Id.* ¶ 21. DI is governed by a Division I Council and a Board of Directors ("D1 Board of Directors"), comprised of 12 presidents and chancellors from each athletic conference, and numerous committees. *Id.* The D1 Committee on Academics, which reports to the D1 Board of Directors, manages eligibility standards and

---

[1] McKinney's Complaint is largely identical to the complaint in *Manassa v. NCAA*, No. 1:20-cv-3172-RLY-MJD. The facts will therefore are similar to the summary in the Entry on Defendants' Motion to Dismiss in *Manassa*. No. 20-cv-3172, 2021 WL 12231121 (S.D. Ind. Sept. 13, 2021).

administers the Academic Performance Program. *Id.* The D1 Board of Directors is responsible for enacting policy and legislation that govern DI.

### 2. **HBCUs**

For many years in the United States, the education of Black people, free or enslaved, was prohibited. *Id.* ¶ 24. Even after the Civil War, the doors of white educational institutions were closed to Black people, so HBCUs were developed as the primary avenue for providing post-secondary education to Black students. *Id.* ¶ 25. Historically, HBCUs had fewer resources, poorer facilities, and smaller budgets than white institutions, and they have received less support from state and federal governments. *Id.* ¶ 31. Today, there are 101 HBCUs in 19 states that enroll almost 300,000 students, approximately 80% of whom are Black, 70% of whom are low-income, and many of whom are first-generation students. *Id.* ¶ 33.

### 3. **NCAA's Academic Performance Program**

Once a student-athlete has selected which DI school they will attend, they sign a National Letter of Intent ("NLI"). *Id.* ¶ 59. The NLI is a valid, binding contract in which the student-athlete agrees to attend and compete for a certain school in exchange for financial aid for a particular number of years and the opportunity to participate in NCAA athletics. *Id*. The NCAA controls all aspects of the NLI process. *Id.* ¶ 60. Student-athletes must also sign a Student Athletic Statement (the "Statement"), which is issued by the NCAA, to be eligible to participate in intercollegiate competitions. *Id.* ¶ 61. The Statement incorporates the NCAA D1 Manual (the "Manual"), which is comprised of several NCAA governing documents and sets forth student-athlete obligations and NCAA promises (the NLI, Statement, and Manual, collectively, the "Contracts"). *Id.* ¶ 61. Once a student-athlete participates in NCAA sports, that student is bound by the NCAA's bylaws and regulations, including the D1 Manual. *Id.* ¶ 62.

Until 1965, the time of desegregation, the NCAA imposed little to no academic requirements on student-athletes. *Id.* ¶ 66. Since then, the NCAA's academic requirements have undergone numerous revisions. *Id.* ¶¶ 76–85. With each new eligibility requirement, there was significant evidence that Black student-athletes were being disproportionately affected. *Id.* ¶¶ 69, 73, 76, 80, 84–85.

After several additional revisions to the academic eligibility requirements, the NCAA finally settled on the Academic Performance Program in 2004. *Id.* ¶ 87. For the first time, teams, as opposed to individual student-athletes, were subject to sanctions. *Id.* The key components of the Academic Performance Program are two metrics: the Graduation Success Rate ("GSR") and the Academic Progress Rate ("APR"). *Id.* ¶ 91. The GSR is the NCAA's calculation of student graduation rates, including transfer students. *Id.* The APR is a team-based measurement of eligibility, retention, and graduation. *Id.* Each student-athlete who receives an athletic scholarship earns one point for continuing enrollment and one point for remaining academically eligible pursuant to NCAA guidelines. *Id.* ¶ 92. The team's total points are divided by points possible and multiplied by 1,000, resulting in the APR. *Id.*

The NCAA designed the Academic Performance Program with race in mind to respond to allegations of discrimination against Black student-athletes. *Id.* ¶¶ 95–96. According to McKinney, however, the formula on which the Academic Performance Program was based included metrics that the NCAA knew would directly and negatively affect Black student-athletes, but the NCAA implemented the new system anyway. *Id.* ¶ 96. For example, in the 1998–1999 academic year, the GSR for Black student-athletes was 59%, as compared to 82% for white student-athletes. *Id.* ¶ 97. Despite knowledge of this disparity in GSRs, the NCAA continued to

4

rely on the GSR in determining APR, even though there was little to no correlation between GSR and a particular student's academic success.  *Id.* ¶¶ 98–99.

In 2011, the NCAA implemented the current penalty structure, and it did so with knowledge that the revised programs would more heavily impact HBCUs than predominantly white institutions ("PWIs").  *Id.*  ¶ 106–07.  In response, the Division I Committee on Academic Performance, the body responsible for overseeing the APR, recommended the D1 Board establish the Historically Black Colleges and Universities and Low Resource Institution Academic Advisory Group to assist on issues affecting HBCUs.  *Id.* ¶¶ 104, 108.  However, this Advisory Group was largely marginalized by the NCAA, and its recommendations were ignored.  *Id.* ¶ 109.

The Academic Performance Program penalties have been disproportionately applied to HBCUs for more than a decade.  *Id.* ¶ 130.  HBCUs comprise only 6.5% of DI schools (23 out of 350), but they make up 72% of the 159 teams that have been banned from post-season play since 2010 (114 of 159).  *Id.* ¶ 131.  An HBCU team is 43 times more likely to receive a post-season ban than a PWI team.  *Id.* ¶ 133.  Not only does the Academic Performance Program disproportionately punish HBCUs, but the NCAA now provides financial awards to schools that consistently achieve high APRs.  *Id.* ¶ 141.

### 4. Post-season Bans

Post-season bans exclude student-athletes from all post-season events, including NCAA championships, football bowl games, and the men's and women's basketball tournaments.  *Id.* ¶ 146.  These competitions are nationally televised and provide student-athletes with significant exposure to fans, professional scouts, corporate sponsors, and the public.  *Id.* ¶ 147.  The loss of this national stage denies players the opportunity to further their athletic careers, receive media coverage, and improve play-based metrics, which can alter subsequent career trajectories.  *Id.* ¶ 148.  It also affects players' confidence in their HBCUs, teams, and themselves.  *Id.* In all these

ways, McKinney alleges the NCAA's post-season bans interfere with Black student-athletes receiving the full benefits and privileges of their Contracts. *Id.* ¶¶ 151–53.

### 5. Purported Class

McKinney bring this action on behalf of the following "Injunctive Relief Class": "All current Black student-athletes participating in Division I HBCU athletic teams during the academic year 2022–23 through the date of class certification." *Id.* ¶ 163.

### B. Procedural History

#### 1. *Manassa v. NCAA*

In December 2020, the same counsel representing McKinney filed a class action lawsuit in asserting the similar claims in *Manassa v. NCAA*, No. 1:20-cv-3172-RLY-MJD ("*Manassa*"). The *Manassa* plaintiffs, Troyce Manassa ("Manassa"), Austin Dasent ("Dasent"), and J'Ta Freeman ("Freeman"), were current or former DI HBCU student-athletes. Manassa and Dasent were subject to Academic Performance Program post-season bans while they were student-athletes, but they were not student-athletes at the time they filed suit. Freeman, like McKinney, was a current DI student-athlete when she filed suit but had not been subjected to a post-season ban. *Manassa*, No. 20-cv-3172, 2021 WL 12231121, at *1 (S.D. Ind. Sept. 13, 2021).

The NCAA moved to dismiss the *Manassa* plaintiffs' claims on several grounds (*Manassa*, Dkt. 2). On September 13, 2021, the Court denied the NCAA's motion as to Manassa and Dasent but granted it as to Freeman for lack of standing:

> [Freeman] claims to have standing based on Howard University's lacrosse team receiving postseason bans in the past, her intention of participating on the team in the upcoming season, and the increased risk that she and her team will be banned from the postseason in the future because of the APP. This is insufficient to establish standing.
>
> An allegation of future injury may establish standing if the threatened injury is "certainly impending," or there is a "'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted); *see*

6

> *also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ([a]llegations that convey a "possible future injury are not sufficient."). The Complaint does not plausibly allege that a postseason ban is "certainly impending," so the question then is whether there is a "substantial risk" of future harm.
>
> Freeman has not plausibly alleged that there is a substantial risk that she and her team will receive a postseason ban in light of the "highly speculative" and "attenuated chain of inferences" required to find harm here. *Id.* at 410, 414 n.5 (2013). Freeman alleges that she intends to join the lacrosse team; that HBCUs constitute 72% of teams banned since 2010, even though they comprise only 6.5% of all DI schools; HBCU teams are 43 times more likely than predominantly white teams to receive a postseason ban under the APP; and the NCAA already banned the Howard lacrosse team from the postseason in 2012–2013 and 2014–2015. (Complaint ¶¶ 174–76, Appx. A). Based on her allegations, Freeman asks the court to make the following inferences: that she is in fact on the team, that the team's APR will be lower than the last several years when the team did not receive a postseason ban, and that the team's score will be below the NCAA cut score for this year. Further, there is no indication that the current lacrosse team is at risk of a postseason ban for violating the APP: while the team was banned several years ago, the team could have achieved near perfect academic performance for the last several years. Overall, Freeman's fear of a postseason ban is highly speculative, and the court cannot conclude that Freeman faces a substantial enough risk of harm to confer standing.

*Manassa*, 2021 WL 12231121, at *5–6.  In January 2022, the parties stipulated to the dismissal of Dasent without prejudice, leaving Manassa as the sole named plaintiff.  (*Manassa*, Dkt. 75.)

Manassa filed his motion for class certification in March 2023.  Embedded within his supporting brief, Manassa cursorily requested "that the Court reconsider its decision to dismiss original plaintiff in this lawsuit, J'Ta Freeman" or "alternatively provide [him] a reasonable time period to substitute an appropriate class representative." (*Manassa*, Dkt. 177 at 3–4.)  However, the court determined that Manassa waived this issue "'by failing to raise [it] other than by a passing reference.'"  *Manassa*, 2023 WL 10367398, at *6 n.3 (quoting *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021); *Chi. Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 817 (7th Cir. 2018)).  In June 2023, the NCAA moved for summary judgment against Manassa on several grounds, including lack of standing.  *Manassa*, 2023 WL 10367398, at *1.  In response to the summary judgment motion, Manassa argued Freeman had standing to represent the putative class

7

and stated that in his class certification briefing, he had alternatively requested additional time "to substitute an appropriate class representative." (*Manassa*, Dkt. 243-1 at 77 & n.226.)

On Friday, August 4, 2023, while the class certification and summary judgment motions were pending, McKinney initiated this action. The following Monday, she moved to intervene in *Manassa* (*Manassa*, Dkt. 255). In support of her Motion to Intervene, McKinney argued:

> Plaintiff [Manassa] requested that the Court reconsider its decision to dismiss Ms. Freeman and appoint her as representative for the Injunctive Relief Class, or, in the alternative, provide Plaintiff with time to substitute an appropriate class representative. Plaintiff reiterated this request in his memorandum in opposition to defendant's motion for summary judgment. . . .
>
> [McKinney] moved to intervene once she began playing for GSU and only a short time after the dismissal of J'TA Freeman and the NCAA's opposition to Manassa's motion for class certification, recognizing that Mr. Manassa may not be able to represent the Injunctive Relief Class. Her intervention will not prejudice the NCAA or Manassa because she was already an unnamed member of the proposed Injunctive Relief Class. . . .
>
> McKinney plainly has an interest in the subject at issue in *Manassa*: she is a current Black-student-athlete who brought the same claims of discrimination related to the same discriminatory program against the same defendant and she is a member of the proposed Injunctive Relief Class in *Manassa*.

(*Manassa*, Dkt. 255 at 2–3, 5–6). The court denied the Motion to Intervene in *Manassa* because even though McKinney and Manassa's claims "share[d] common questions of law or fact," allowing McKinney to intervene so late in the case would further delay litigation and prejudice the NCAA. *Manassa*, No. 20-cv-3172, 2023 WL 5722677, at *2 (S.D. Ind. Sept. 5, 2023).

On October 19, 2023, Judge Young granted the NCAA's motion for summary judgment based on lack of standing and the statute of limitations, and it denied Manassa's motion for class certification. *Manassa*, 2023 WL 10367398, at *3. On February 9, 2024, final judgment was entered in *Manassa* (*Manassa*, Dkt. 303). On March 8, 2024, plaintiffs' counsel filed Notices of Appeal as to the court's order on the NCAA's motion to dismiss, its order denying McKinney's Motion to Intervene, and the summary judgment order and final judgment (*Manassa*, Dkt. 304–

8

306).  These appeals were consolidated and are still pending before the Seventh Circuit Court of Appeals.  *Manassa v. NCAA*, No. 24-1373 (7th Cir. Mar. 11, 2024).

2.      **The Instant Lawsuit**

On August 4, 2023, shortly before moving to intervene in *Manassa*, McKinney filed the Complaint in this action, which is largely identical to the original and amended complaints in *Manassa* ([Filing No. 1](Filing No. 1)).  On October 13, 2023, one month after the Court dismissed Freeman's claims for lack of standing, the NCAA filed the instant Motion to Dismiss McKinney's claims for the same reason ([Filing No. 15](Filing No. 15)).  The parties filed their response and reply briefs in November 2023 ([Filing No. 31](Filing No. 31); [Filing No. 32](Filing No. 32)).

Over the next several months, the NCAA obtained leave to file two supplements in support of its Motion to Dismiss ([Filing No. 78](Filing No. 78); [Filing No. 95](Filing No. 95)).  In the second supplement (the "Second Supplement"), the NCAA cites evidence that McKinney left Grambling in the spring of 2024 and transferred to a Division II HBCU school.  McKinney filed a response to the Second Supplement (the "Response to the Second Supplement"), with exhibits, arguing that her transfer does not moot her claims pursuant to the "inherently transitory" exception ([Filing No. 97](Filing No. 97)).  The NCAA then filed a reply stating that the NCAA has not yet raised a mootness argument, and that the Second Supplement relates solely to whether McKinney lacked standing from the outset of this action ([Filing No. 101](Filing No. 101)).  The NCAA then moved to strike any portions of McKinney's Response to the Second Supplement referring to mootness, and all attached exhibits ([Filing No. 102](Filing No. 102)).

The Motion to Dismiss and Motion to Strike are now both ripe for the Court's review.

II.     **LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  The burden of proof is on the plaintiff, the party asserting jurisdiction.  *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on*

9

*other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc). "The plaintiff has the burden of supporting the jurisdictional allegations of the complaint by competent proof." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). "In deciding whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *Id*.

"When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (citation omitted). Furthermore, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (citation and quotation marks omitted).

### III.   DISCUSSION

The Court will address the NCAA's Motion to Dismiss and then its Motion to Strike.

**A.   Motion to Dismiss**

The NCAA argues that McKinney lacks standing to pursue her claims for injunctive relief for the same reasons as Freeman in *Manassa*. McKinney cannot demonstrate a "concrete and particularized" and "actual or imminent" injury since she has not experienced, is unlikely to ever experience, a postseason penalty under the Academic Performance Program (Filing No. 16 at 15–16). The NCAA also argues that if McKinney attempts to "take her own allegations out of context and argue that her alleged injury is not related to postseason penalties, but rather some generalized lost opportunity to compete and fully benefit from participation in DI athletics due to the mere existence of the APP," then she would still lack standing because "any such alleged injuries are neither concrete nor particularized." *Id.* at 24.

10

McKinney responds that the NCAA "misconstrues" her claims by "try[ing] to bring the claims in this case under the umbrella of a different case stemming from the discriminatory APP," *Manassa* (Filing No. 31 at 6). She repeatedly asserts that "[t]his case is not about postseason competition." *Id.* at 6; *id.* at 7 ("But this case is not about postseason penalties."); *id.* at 11 ("[T]his case is not about postseason bans."). She argues that "[c]laims about [her] risk of facing a postseason ban are *irrelevant* to the legal question of standing . . . and the Court need not consider them." *Id.* at 17 (emphasis added). McKinney instead contends that her claims are based on "the *barrier* the APP imposes—and all that the barrier brings *even if [Black student-athletes] surpass it* and go on to achieve success under the APP," like "higher, more burdensome academic standards—demanding more study time, more stress, less playing time, inflicting emotional harm, and saddling them with difficulties PWI student-athletes do not face under the APP." *Id.* at 9 (emphasis in original).

The NCAA raises two overarching arguments on reply: (1) the injuries alleged in the Complaint arise from postseason penalties, like in *Manassa*, not generalized barriers imposed by the Academic Performance Program; (2) the Complaint does not adequately allege any particularized injury arising from the "barriers" described in McKinney's response brief. The Court agrees with both of the NCAA's arguments and will address each in turn.

   **1. McKinney's Injuries Compared to *Manassa***

McKinney insists that her claims do not relate to the Academic Performance Program's postseason penalties like in *Manassa*. But based on the record here and in *Manassa*, that is simply not true. As the NCAA notes, the first sentence of the Complaint states:

> Plaintiff Brenda McKinney on behalf of herself and the Injunctive Relief Class described below, by and through her attorneys, brings this class action complaint against the defendant, the [NCAA], for injunctive relief **on the same bases as alleged in *Manassa v. National College Athletic Association*, No. 1:20-cv-3172-RLY-MJD**.

11

(Filing No. 1 at 3 (bold emphasis added)).  The Complaint is also nearly identical to the complaint in *Manassa* and mentions "postseason" penalties approximately forty-six times (Filing No. 1; Filing No. 32-1 (comparing complaints); *see also Manassa*, Dkt. 1, Dkt. 206).

Specific allegations in the Complaint further confirm that this case is about postseason penalties.  Count I, which alleges a violation of civil rights under 42 U.S.C. § 1981, is based on the alleged deprivation of putative class members' right to make and enforce the Contracts (Filing No. 1 at 42), and the Complaint clearly alleges that "the *NCAA's postseason bans* interfere with student-athletes' Contracts. . . . The NCAA adopted and continues to enforce the Academic Performance Program and its postseason ban penalties to deny full participation and full Contracts benefits to Black student-athletes."  *Id.* ¶¶ 151, 180 (emphasis added); *see id.* ¶¶ 146–49 ("Postseason bans exclude student-athletes from all postseason events . . . . The NCAA's postseason bans deny players the opportunity to further compete with their peers . . . . The full opportunity to compete also impacts student-athletes' opportunities for careers in coaching and the business of collegiate professional sports."). In Count II, which alleges a violation of civil rights under 42 U.S.C. § 1985(3), McKinney alleges "[c]lass members were deprived of due process *when they were banned from postseason play* through the NCAA's discriminatory creation and implementation of its APP . . . ." *Id.* ¶ 203 (emphasis added).

The risk of irreparable harm alleged in the Complaint is also plainly tied to postseason penalties.  The Complaint alleges,

> [a]ll current student-athletes at Division I HBCUs are currently at risk of irreparable harm . . . due to the NCAA's enforcement of the APP and disproportionate levying of the APR-related penalties upon HBCU teams.
>
> This harm, including lost postseason access, lost opportunities, and lost future revenue and career advancement, cannot be undone, reversed, or adequately remedied by monetary compensation.

*Id.* ¶¶ 154–55.

The timing of this action also shows that McKinney's claims are the same as those asserted in *Manassa*.  McKinney filed her Complaint in this action one business day before filing a Motion to Intervene in *Manassa*, which asked the Court to allow McKinney to serve as a substitute for Freeman ([Filing No. 1](); *Manassa*, Dkt. 255).  In her reply in support of her Motion to Intervene, McKinney stated:

> The *McKinney* case and the *Manassa* case are nearly duplicative . . . . The only difference is the remedies they seek: Plaintiff Troyce Manassa is a former NCAA student-athlete seeking damages, and Brenda McKinney is a current NCAA student-athlete seeking injunctive relief.
>
> Notwithstanding, the NCAA would have this Court deny McKinney's intervention and allow her to pursue the very same issues, written discovery, depositions, expert reports, and corresponding disputes in a separate lawsuit. . . .
>
> [I]f the Court finds that neither Manassa nor Freeman are appropriate representatives of the Injunctive Relief Class, this Court should permit McKinney's intervention here, rather than require the putative class members to engage in a complete do-over of the litigation under a different case number. . . .
>
> Given that Manassa and McKinney seek to hold the NCAA liable based on the same course of conduct and under the same legal theories, a decision on Manassa's claims will have a clear impact on McKinney's claims.

(*Manassa*, Dkt. 271 at 3–4, 7, 10).  McKinney repeated these arguments in her Rule 72 objection to the Magistrate Judge's order denying her Motion to Intervene (*Manassa*, Dkt. 288 at 1, 7 ("There is no dispute that McKinney has an interest in the subject of *Manassa*, nor is there any dispute that *McKinney* shares claims, defenses, and common questions of law and fact with *Manassa*.")).

The court in *Manassa* acknowledged the identity of claims between this action and *Manassa*, despite concluding that McKinney's intervention should not be permitted.  *Manassa*, 2023 WL 5722677, at *1 ("[E]ven if the pending motion for class certification is denied, McKinney would not be precluded from seeking redress in her own, currently pending action, in which she alleges the same claims as Manassa. . . ."); (*Manassa*, Dkt. 297 at 14 n.4 ("The *McKinney* Class

13

Action Complaint asserts the same claims and seeks the same injunctive relief as those presented in this putative class action but includes a different class period . . . .")).

In light of the Complaint's allegations, McKinney's prior statements, and the timing of this litigation, the Court cannot accept McKinney's assertion that her Complaint is not about the Academic Performance Program's postseason penalties. The record is clear—McKinney was intended to serve as a substitute for Freeman, and the claims asserted in this action are the same as Freeman's claims in *Manassa*, which arose from the risk of postseason penalties. Freeman lacked standing because the risk of postseason penalties was too remote, and here, McKinney faces even less of a risk of postseason penalties than Freeman did because Grambling, unlike Howard, has never experienced a postseason penalty (Filing No. 16 at 8). McKinney therefore lacks standing for the same reasons as Freeman. *Manassa*, 2021 WL 12231121, at *5–7.

Plaintiff's counsel understandably wants to avoid refiling these same class action claims on behalf of yet another named plaintiff (*Manassa*, Dkt. 271 at 5), but they cannot avoid dismissal by improperly amending the Complaint through a response brief. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (stating plaintiff could not amend complaint "through arguments in his brief in opposition to a motion for summary judgment").

### 2. "Barriers" Described in Response Brief

The NCAA argues that even if McKinney were asserting claims based on "barriers" imposed by the Academic Performance Program apart from postseason penalties, she still fails to sufficiently identify a "particularized" injury caused by those barriers, so she lacks standing. "From Article III's limitation of the judicial power to resolving 'Cases' and 'Controversies'," and the separation-of-powers principles underlying that limitation, [the Supreme Court] ha[s] deduced a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (quoting *Lujan v.*

14

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  This constitutional minimum is jurisdictional.  *See Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015).  To establish Article III standing, a plaintiff must show

> (1) [she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citation and quotation marks omitted).

McKinney's response only offers a generalized description of "injuries" caused by the alleged "barriers," but neither her response brief nor her Complaint specify what those barriers are, much less what particularized injury those barriers have caused.[2]  McKinney refers to "barriers to meeting APP standards," but the barriers to *meeting* Academic Performance Program standards are not caused by the Academic Performance Program itself (Filing No. 31 at 5).

McKinney also refers to "barriers to competing in collegiate athletics," but as the Complaint makes clear, those "barriers" to competition are postseason penalties.  *Id.*  McKinney confirms as much in her response, where she attempts to establish standing by alleging that the Academic Performance Program denies Black student-athletes:

> (a) the ability to compete with their peers (and the benefits attendant thereto); (b) the ability to further develop their athletic and professional careers; (c) the ability to receive greater media exposure, coverage, and acclaim; (d) participating in the pinnacle of college athletic competition; (e) the ability to improve and achieve meaningful play-based metrics, which affects subsequent career trajectory; and (f) the ability to garner the attention of and access to recruiters and sponsors, including the lucrative post-college benefits they offer.

(Filing No. 31 at 12 (citing Filing No. 1 ¶ 194)).  The Complaint alleges that the denial of these benefits, privileges, terms, and conditions, arise from the imposition of postseason penalties, not

---

[2] Plaintiff's counsel briefly raised this same argument in opposition to the NCAA's motion to dismiss Freeman's claims in *Manassa* (*Manassa*, Dkt. 35 at 21).

15

the mere existence of the Academic Performance Program (Filing No. 1 ¶¶ 164, 151–52, 194). The postseason penalties are therefore the only "barrier" to competition.

McKinney explains that the Academic Performance Program imposes barriers even if she and putative class members surpass Academic Performance Program standards because the Academic Performance Program demands "more study time, more stress, [and] less playing time, inflicting emotional harm, and saddling them with difficulties PWI student-athletes do not face under the APP." (Filing No. 31 at 8.) But importantly, the Academic Performance Program only requires this additional work and stress *to avoid postseason penalties*. *Id.* at 20. Absent the risk of postseason penalties, there would be no injury to HBCU student-athletes.

Nowhere in the Complaint does McKinney allege that she (or putative class members) suffered or will suffer any irreparable harm separate from the risk of postseason penalties. And as the court held in *Manassa*, the risk of postseason penalties is too remote to confer Article III standing. McKinney's generalized grievances about how Academic Performance Program standards effect HBCU student-athletes, no matter how principled, are not enough. She must show a concrete and particularized injury, and she has not done so. The Court therefore **grants** the NCAA's Motion to Dismiss.

  **3.**  **Leave to Amend**

At the conclusion of her response, McKinney asks that if the motion to dismiss is granted, she requests leave to amend her Complaint (Filing No. 31 at 22). The NCAA argues that leave to amend would be inappropriate, since McKinney's lack of standing deprives this Court of subject-matter jurisdiction (Filing No. 32 at 21).

Although McKinney has not established subject matter jurisdiction, the Court may still give her an opportunity to amend her pleading before dismissing this case. *See, e.g.*, *Notre Dame Affordable Hous., Inc. v. City of Chi.*, 838 F. App'x 188, 189, 191 (7th Cir. 2020) (affirming district

court's dismissal of case for lack of standing after giving plaintiff two opportunities to amend). "Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 & n. 3 (7th Cir. 2004). The NCAA has not shown that any amendment is unwarranted, and the Court is not persuaded that an amendment would be futile. The Court therefore **grants** McKinney leave to file an amended complaint.

### B. Motion to Strike

The NCAA also asks the Court to strike all portions of the Response to the Second Supplement referring to mootness, as well as all exhibits attached to the Response. The NCAA argues that it cited evidence of McKinney's transfer to a Division II school only to emphasize that McKinney never had standing to bring suit, not to argue that McKinney's claims have become moot (Filing No. 102). McKinney opposes the Motion to Strike, arguing that her transfer speaks to "mootness, not standing." (Filing No. 107.)

The doctrines of mootness and standing are related. "Mootness is 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness).'" *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 516 (7th Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). McKinney is therefore correct that questions of mootness are relevant to determining whether she has standing, and that the evidence of her transfer is relevant to mootness. But the NCAA is correct that a plaintiff cannot use an exception to mootness to save her claims from dismissal if she lacked standing from the start.

Because the Court has determined McKinney lacked standing at the time she filed her Complaint, she cannot have subsequently *lost* standing, and questions of mootness are irrelevant.

17

*See, e.g.*, *Pugh v. NCAA*, No. 15-cv-1747, 2016 WL 5394408, at *5 (S.D. Ind. Sept. 27, 2016) (finding the plaintiff's "inherently transitory" arguments persuasive but denying class certification because "at no point in the life of this case, did [plaintiff] have standing to seek injunctive relief"); *Rock v. NCAA*, No. 12-cv-1019, 2016 WL 1270087, at *16 (S.D. Ind. Mar. 31, 2016) (same). If McKinney files an amended complaint and can establish her standing at the time she filed the original Complaint, then the parties may dispute mootness. It would be premature to address mootness at this time. The Court therefore **grants** the NCAA's Motion to Strike.

## IV.     CONCLUSIONS

For the above reasons, the Court **GRANTS** the NCAA's Motion to Dismiss (Filing No. 15) and **GRANTS** the NCAA's Motion to Strike (Filing No. 102). McKinney's Response in Opposition to the Defendant's Supplement to its Motion to Dismiss (Filing No. 97)—other than Section A of the Argument (*id.* at 11–12)—and all exhibits attached thereto (Filing No. 97-1; Filing No. 97-2; Filing No. 97-3; Filing No. 97-4; Filing No. 97-5; Filing No. 97-6; Filing No. 97-7; Filing No. 97-8; Filing No. 97-9; Filing No. 97-10; Filing No. 97-11; Filing No. 97-12; Filing No. 97-13) are **STRICKEN**.

McKinney is **GRANTED LEAVE** to file an amended complaint no later than **thirty (30) days from the date of this Order**. If nothing is filed by that date, then this action will necessarily be dismissed for lack of subject-matter jurisdiction.

**SO ORDERED**.

Date:   9/20/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Elizabeth A. Fegan
FEGAN SCOTT, LLC
beth@feganscott.com

Jessica Meeder
MAY JUNG
jessica@mayjung.com

Jonathan David Lindenfeld
FEGAN SCOTT LLC
jonathan@feganscott.com

Russell B. Cate
RILEYCATE, LLC
rcate@rileycate.com

Sundeep Singh
RILEYCATE LLC
ssingh@rileycate.com

William N. Riley
RILEYCATE LLC
wriley@rileycate.com

Alicia Barrs
BARNES & THORNBURG LLP
alicia.barrs@btlaw.com

Anna Kalinina
BARNES & THORNBURG LLP
anna.kalinina@btlaw.com

Autumn C Gear
BARNES & THORNBURG LLP
autumn.gear@btlaw.com

Brian Eugene Casey
BARNES & THORNBURG LLP
brian.casey@btlaw.com

Jake Winslett
BARNES & THORNBURG LLP
jake.winslett@btlaw.com

Valerie Chisara Ezie-Boncoeur
BARNES & THORNBURG LLP
cezie@btlaw.com

Victor D Vital
BARNES & THORNBURG LLP
victor.vital@btlaw.com