## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| BRENDA MCKINNEY, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>     Defendant. | Case No.:  1:23-cv-1372-TWP-MJD |

## FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 3

PARTIES .............................................................................................................................. 3

FACTS ................................................................................................................................. 5

    A.   The mission of HBCUs focuses on countering systemic discrimination through the education of historically disadvantaged Black students. .................................. 5

        1.   The role of HBCUs in education. ........................................................................ 5

        2.   The history of HBCUs in NCAA athletics ........................................................ 9

    B.   The NCAA has purposefully implemented academic requirements knowing they discriminate against Black student-athletes at DI HBCUs. ......................... 12

    C.   The NCAA discriminated against Black student-athletes at HBCUs when it considered race in the design and implementation of the APP ........................... 17

        1.   The Mechanics of the APP ............................................................................... 17

        2.   The APP's Discriminatory Treatment of DI HBCUs and the Class ................... 19

        3.   The APP's Rewards to PWIs ........................................................................... 26

    D.   The NCAA's conduct has and will continue to injure Class Members. ................... 27

TOLLING OF STATUTE OF LIMITATIONS ............................................................. 28

CLASS ALLEGATIONS .................................................................................................. 29

CAUSES OF ACTION ...................................................................................................... 30

PRAYER FOR RELIEF ................................................................................................... 36

Plaintiff, Brenda McKinney, individually and on behalf of all Black student-athletes at Division I Historically Black Colleges and Universities, by and through her attorneys, complains of the National Collegiate Athletic Association ("NCAA") as follows:

## INTRODUCTION

1.   The NCAA promises that eligible student-athletes will have opportunities to compete without barriers based on race and that their academic progress will be judged on the same basis as the student-body at their respective schools.

2.   Notwithstanding these promises, the NCAA's Academic Performance Program ("APP") discriminates against Black student athletes at Division I ("DI") Historically Black Colleges and Universities ("HBCUs") (the "Class").

3.   Through the APP, the NCAA imposes a system of rules, rewards, and penalties that disproportionately burdens and harms the Class. Class members are more likely to be penalized under the APP, less likely to be rewarded, and even more fundamentally they face barriers to meeting APP standards that students at PWIs do not face.

4.   Through the APP, the NCAA required student-athletes to meet a single academic benchmark called the Academic Progress Rate ("APR"), regardless of the type of school they attended (for example, an Ivy League school or a state school).

5.   The NCAA thus judged the academic progress of Class members against this APR and not against the student body at their HBCUs.

6.   The APR requires the Class to exceed their own schools' academic standards. In contrast, it allows student-athletes at predominantly white institutions ("PWIs") to fall well behind the academic performance of their non-athlete peers.

7.    The NCAA set the APR knowing the likelihood that HBCU teams and their Black student-athletes would disproportionately be unable to meet the APR.  The APP thus imposes barriers on Black student-athletes at HBCUs that place them on unequal footing with student-athletes at PWIs with respect to, *inter alia*, meeting APP standards, avoiding APP penalties, receiving APP awards, and competing in collegiate athletics without the burden and distraction of the discriminatory APP.

8.    Plaintiff and other Class members were (and Class members continue to be) discriminated against by the barrier the APP imposes – and all that the barrier brings even if they surpass it and go on to achieve success under the APP. The Class is held to higher, more burdensome academic standards – demanding more study time, more stress, less playing time, inflicting emotional harm, and saddling them with difficulties PWI student-athletes do not face under the APP. Put simply: the NCAA makes it harder for Black student-athletes at HBCUs to be successful under the APP—and in intercollegiate athletics—than others. That deprives them of equal participation and is discriminatory.

9.    This denial of equal treatment resulting from the imposition of the APP injured Plaintiff and the Class members.

10.    The Supreme Court has made clear that barriers like this are discriminatory and illegal – regardless of whether Plaintiff or other class members should have, would have, could have, or did overcome them. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (citation omitted).

11.    Because Plaintiff and Class members were indisputably subject to the APP, they were harmed by a discriminatory policy which violates 42 U.S.C. §§ 1981 and 1985 and which is remediable by a classwide injunction.

## JURISDICTION AND VENUE

12.    Plaintiff brings these claims under 42 U.S.C. §§ 1981 and 1985. This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. § 1331.

13.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; (c) at least one Plaintiff is a citizen of a different state than at least one Defendant; and (d) members of the class are citizens of a state and at least one of the Defendants is a citizen or subject of a foreign state.

14.    This Court has personal jurisdiction over the NCAA as an unincorporated association residing and conducting operations in this District.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the NCAA resides in this District.

## PARTIES

16.    **Plaintiff Brenda McKinney** is a Black student-athlete who was on the women's basketball team at Grambling State University ("GSU"), an NCAA DI HBCU, during the 2023-24 school year and at the time she filed this lawsuit.

17.    GSU sports teams have received penalties under the APP in the past, including Level One penalties (reduction in practice time) and Level Three penalties (postseason competition ban). For example, the NCAA imposed postseason competition bans on three GSU sports teams in 2017, and one GSU sports team in each of 2018, 2019, and 2020. Moreover, the GSU women's basketball team has previously missed the APR benchmark, including in 2016 and 2017.

18.    Because GSU offered just two academic tutors to its student-athletes in fall 2023 and zero in spring 2024, Plaintiff was unable to get the academic support she needed, resulting in

Plaintiff's decision to enter the transfer portal and leave GSU after the 2023-24 school year ended. Seeking a school that could provide the academic support she needed, Plaintiff transferred to the University of the District of Columbia for the 2024-25 academic year.

19.     While Plaintiff has relied on her lawyers for legal expertise, she is committed to representing the Class members in this lawsuit. She has been in constant consultation with her lawyers regarding the case. Her dedication is demonstrated by the significant time she spent preparing for her deposition, missing three days of work to travel to Indianapolis for the court-ordered settlement conference as well as her in-person deposition.

20.     NCAA student-athletes are recognized as a class of persons whose tenures as student-athletes are uncertain because of natural graduation timing as well as issues outside their control, such as NCAA rules capping the years of eligibility; career-ending injuries; coaches who run student-athletes off a team; HBCUs that close or reduce their programs (such as the tutors at GSU); HBCUs that move from DI to DII; and a myriad of other reasons.

21.     Thus, while Plaintiff transferred due to academic reasons, Plaintiff continues to be motivated to pursue a remedy for the ongoing discrimination by the NCAA on behalf of the Class as there will continue to be a constant group of Black student-athletes at DI HBCUs subject to the NCAA's discrimination until the trier of fact renders a verdict.

22.     **Defendant NCAA** is an unincorporated association that acts as the governing body of college sports. Its principal office is in Indianapolis, Indiana.

23.     In 1952, the NCAA imposed rulemaking and enforcement authority over its members.

24.     Since 1973, the NCAA's member schools have been organized into three divisions—Division I, Division II, and Division III.

4

25.     Each Division has a particular set of rules and guidelines governing athletics. DI, the most prestigious division, contains approximately 350 of the NCAA's 1,200 member schools.

26.     The rules – and thus terms of the contract – that both the NCAA and the Division I student-athletes agree to follow are contained in the NCAA's DI Manual (the "Manual").

27.     The NCAA requires that student-athletes sign a Student-Athlete Statement, which affirms their commitment to the rules, annually.

28.     In the rules, the NCAA promised Plaintiff and Class members benefits associated with NCAA competition, including, for example: (i) providing a "Commitment to Diversity and Inclusion" by "creat[ing] diverse and inclusive environments" that "include diverse perspectives in the pursuit of academic and athletic excellence"; and (ii) enacting student-athlete academic standards that would be "consistent" with the standards adopted by their institutions for the "student body in general."

## FACTS

### A.  The mission of HBCUs focuses on countering systemic discrimination through the education of historically disadvantaged Black students

#### 1.  The role of HBCUs in education

29.     Historically, education of Black people in the United States, including enslaved persons, was prohibited.

30.     The Civil War ended slavery but did not provide Blacks access to white educational systems. HBCUs thus developed as a way to educate formerly enslaved persons and all Blacks, becoming their primary avenue for postsecondary education.

31.     These efforts persisted despite Ku Klux Klan violence towards and intimidation of Black educators, schools, and students.  In response, Congress passed the Ku Klux Clan Act of

1871,[1] outlawing conspiracies to deprive citizens of their constitutional rights, including the right to equal protection.

32.     The Second Morrill Act of 1890 aided in the development of HBCUs because it required that when states with segregated public higher education institutions provided a land grant to benefit white students, they also had to provide a land grant for the benefit of Black students. As a result, additional institutions dedicated to Black students, now referred to as HBCUs, were established.

33.     "Despite the narrow scope of their intended function, HBCUs grew into significant institutions in the production of research, particularly on the African diaspora.  [HBCUs] became the primary teachers of the previously under and uneducated populace, central repositories of cultural heritage, and stalwart beacons for community uplift." HBCUs accepted students "as they were," including educating those who were underprepared or had "minimal skills." [2]

34.     HBCUs thus comprised the backbone of the educational system for Black students, educating future teachers, doctors, lawyers, and ministers who would serve the Black community in what was still a racially segregated society. Almost all Black college students during this period enrolled at HBCUs.

35.     The Supreme Court's decision in *Plessy v. Ferguson*, 163 U.S. 537 (1896), reinforced America's segregated educational system. Although it required that Black and white schools be "separate but equal," they were not.

---

[1] 42 U.S.C. § 1985.
[2] M. Christopher Brown II and Ronyelle Bertrand Ricard, *The Honorable Past and Uncertain Future of the Nation's HBCUs*, THE NEA HIGHER EDUCATION JOURNAL, Fall 2007, at 120.

36. Black schools, including HBCUs, had fewer resources, poorer facilities, inadequate libraries, and smaller budgets than white institutions, and they received less support from state and federal governments.

37. Although the Supreme Court overruled *Plessy* with *Brown v. Board of Education*, 347 U.S. 483 (1954), many state and local governments were slow to comply with desegregation as the vestiges of discrimination were deeply ingrained, especially in higher education.

38. Today, there are 101 HBCUs in 19 states that enroll almost 300,000 students, approximately 80% of whom are Black, 70% of whom are from low-income families, and many of whom are first-generation students. Although HBCUs represent only 3% of all four-year nonprofit colleges and universities, they enroll 10% of all Black students nationally.

39. HBCUs have awarded 17% of all bachelor's degrees earned by Black students and nearly a quarter of all bachelor's degrees earned by Black students in science, technology, and engineering since the early 2000s.

40. HBCUs have produced 80% of the Black judges, 50% of the Black lawyers, 50% of the Black doctors, 40% of the Black engineers, 40% of the Black members of Congress, and 13% of the Black CEOs in America today.

41. Prominent HBCU graduates include Vice President Kamala Harris, Jesse Jackson, Martin Luther King, Jr., Thurgood Marshall, and Toni Morrison, as well as NFL stars such as Jackson State's Walter Payton, Mississippi Valley State's Jerry Rice, and Alcorn State's Steve McNair, who finished third in Heisman voting in 1994. Doug Williams, a Grambling alumnus, became the first Black quarterback to win a Super Bowl in 1988.

42. In an Executive Order on "Advancing Educational Equity, Excellence, and Economic Opportunity Through Historically Black Colleges and Universities" ("2021 Exec.

Order"), President Biden signed a formal policy to "ensure that HBCUs can continue to be engines of opportunity."

43.    In addition to recognizing that "HBCUs created pathways to opportunity and educational excellence for Black students" in the face of discrimination, the 2021 Exec. Order recognized HBCUs' ongoing and "vital role" in education as a "proven means of advancement for people of all ethnic, racial, and economic backgrounds, especially Black Americans."

44.    Because of our nation's history, "HBCU culture" differs from that of predominantly white institutions ("PWIs"). One HBCU President, Ronald Mason, Jr., explained:

> Q. *** [L]et us know in your opinion the difference between an HBCU culture and a PWI culture?
>
> A. Well, let me see if I could put it in context. So, you know, America's relationship with Black people has not always been, let's say, the most nurturing and embracing relationship, right? …[W]e've had to…learn to take care of each other in…a hostile environment, and so, you know, the culture of HBCUs is reflective of that reality. You know, we give the students that come to us the space to be safe,…to feel loved, and the space to feel at home…in an otherwise…country and environment that can be hostile in many ways, and so it's that embracing of the student as a human being and providing of...the safe haven that gives them time to grow, understand, and learn in ways that they may not be generally able to at non-HBCUs.[3]

45.    President Mason further explained that HBCUs fill a gap in the educational system that nurtures Black students who lacked support "that they should have had in K-12, [HBCUs] have to make up for it when they come to us . . . at the post-secondary level."[4]

---

[3] Transcript of Deposition of Ronald J. Mason ("Mason Tr."), 33:4-34:6.
[4] Mason Tr., 54:18-55:3.

## 2. The history of HBCUs in NCAA athletics

46.     NCAA was established in 1906 by all white leaders at schools in the Ivy League as a non-profit, "voluntary" association, which is now comprised of nearly 1,200 member colleges and universities.  Today, it controls the governance and regulation of college sports.

47.     In 1906, unwelcome by the NCAA, a group of HBCU leaders created the first Black athletic conference: the Inter-Scholastic Athletic Association of the Middle Atlantic States ("ISSA").

48.     In subsequent years, several additional HBCU athletic conferences emerged, including the Central Intercollegiate Athletic Association ("CIAA," 1912), Southern Intercollegiate Athletic Conference ("SIAC," 1913), Southwestern Athletic Conference ("SWAC," 1920), and Mid-Eastern Athletic Conference ("MEAC," 1970).

49.     Before desegregation, many of the country's best Black student-athletes attended HBCUs, which enjoyed national attention for their successes. For example, Hall of Fame coach Eddie Robinson started coaching at Grambling State University in 1941, when it was called Louisiana Negro Normal and Industrial Institute. Under his coaching, Grambling won nine Black college football national championships and sent 200 football players to professional teams.

50.     Despite the inherent inequalities brought about by segregation, HBCU football programs thrived in the middle part of the 20th century. Morgan State won four conference titles in seven years from 1943 to 1949, losing only eight games in that span. Southern University won three conference titles with a 32-0-2 record from 1948 to 1950. Florida A&M lost just four times in 58 games from 1957 to 1962 and produced several AFL and NFL professional athletes.

51.     From 1905 through the 1970s, major NCAA college basketball and football programs were predominantly white, and the southern PWIs were almost exclusively white. During this period, when white players predominated collegiate athletics and before all colleges

9

and universities fully complied with desegregation and other civil rights laws, the NCAA's academic standards were either non-existent or very low and Black student-athletes were largely attending HBCUs.

52.    However, as Southern PWIs suffered numerous failed attempts to avoid desegregation in the 1960s and 1970s, coupled with the increasing success of HBCU athletic programs, the economic value of the Black student-athletes' abilities came into sharper focus for PWIs, and they began recruiting Black student-athletes to their institutions.

53.    At the same time, high dollar television contracts were transforming college sports teams into a lucrative business. Because PWIs were bigger and had more money, they began to siphon the best Black talent from attending HBCUs. Despite the success of HBCU athletic teams, mainstream media did not focus on HBCUs like it did PWIs.

54.    PWIs' newfound focus on recruiting Black student-athletes was based on the commodification of the Black student-athletes' skills and abilities, rather than nurturing each Black student-athlete's whole self, success, and inclusion—the mission of the HBCUs.

55.    In 1984, the Supreme Court ruled in *NCAA v. Board of Regents*, 468 U.S. 85 (1984), that schools should be free to pursue their own television deals. With millions of dollars at stake, television revenue for football and basketball games became the biggest source of revenue for big-time college athletics departments.

56.    By that time, PWIs dominated the recruitment of the top Black student-athletes and thus were able to capitalize on lucrative television deals in the hundreds of millions of dollars, further expanding the economic divide between PWIs and HBCUs.

57.    Today the conferences referred to as the CIAA, SIAC, SWAC, and MEAC are NCAA-recognized conferences that are still comprised completely or predominantly of HBCUs.

10

SWAC and MEAC play Division I sports.   Only two HBCUs—Hampton University and Tennessee State—play in different conferences (Big South and Ohio Valley, respectively).   All HBCUs play in the NCAA DI Football Championship Subdivision, as opposed to the NCAA DI Football Bowl Subdivision. None generate the television or sports-related revenue of PWIs.

58.     In comparison, the Power Five generate significant revenue each year, dwarfing that generated by the MEAC and SWAC.  The Power Five's financial largess is due in large part to television contracts tied to their participation in the postseason bowl games and the men's basketball tournament.

59.     As recently as 2010, the NCAA's broadcasting rights for the NCAA men's basketball tournament were worth just under $550 million per year. In 2011, the NCAA reached a new 14-year, $10.8 billion deal that was worth just north of $770 million annually for the NCAA (with a subsequent extension increasing it to $1.1 billion in 2032). At the same time, the revenue the networks were generating from national TV ad sales during NCAA events more than doubled from $598 million in 2009 to $1.24 billion in 2016.

60.     The television revenue benefits the PWIs and not the HBCUs.  For example, in 2018, the conferences in the Power Five reported the following revenue from television contracts, bowl games, and the men's basketball tournament:

|  |  |
|---|---|
| Big Ten members: | $54 million |
| SEC members: | $43.7 million |
| Big 12 members: | $34.7 million |
| ACC members: | $29.5 million |
| PAC 12 members: | $29.5 million |

61.     That same year, schools in the MEAC and SWAC generated only approximately $1.9 million in revenue from the men's basketball tournament.

62.     In 2014, the NCAA permitted exceptions and carve-outs in its rules and policies for the Power Five, allowing them to change and create their own rules in certain areas, including financial aid and academic support. The Power Five is also now known as the Autonomy Give as the other Division I conferences and teams do not enjoy those same beneficial policies. That same year, the Power Five voted to expand the amount of money they could provide to student-athletes in financial support to include incidentals like transportation and personal expenses.

63.     The net result is that PWI's autonomous structure allows them to continue to generate significantly more revenue in sports, which translates to more resources to recruit top athletic talent and provide state-of-the art educational resources and academic support than their HBCU counterparts.

64.     At the same time, Black student-athletes at HBCUs are placed into an overwhelming cycle of NCAA rules and regulations, and punishments, thereby resulting in rapidly decreasing amounts of already underfunded resources.

**B. The NCAA has purposefully implemented academic requirements knowing they discriminate against Black student-athletes at DI HBCUs**

65.     Until 1965—the time of desegregation—the NCAA imposed little to no academic requirements on student-athletes at all.  Instead, academic eligibility was left to the conferences and member institutions.

66.     After the entry of HBCUs to the NCAA, the NCAA implemented a successive set of academic programs that penalize HBCUs and Black student-athletes for falling short of academic benchmarks that run contrary to HBCU missions.

67.    In 1965—during a tumultuous time in our country's civil rights battle for equal housing, voting, public accommodations, and education—the NCAA established an academic requirement for the first time. The requirement was known as the "1.6" rule, which determined a student-athlete's initial eligibility (*i.e.* freshman eligibility) by using a combination of GPA and SAT scores to predict the first year GPA, which was required to meet or exceed 1.6.

68.    But this method "contributed to the objectification of black males and students from lower socio-economic statuses, who, in some cases were 'functionally illiterate' though participants in intercollegiate competition."[5]

69.    In 1983, the NCAA enacted Proposition 48, an initial eligibility rule requiring student-athletes to have a high school GPA of 2.0 and minimum prescribed SAT and ACT scores. The NCAA knew, based on years of collecting admissions data, that Proposition 48 would exclude 63.7% of Black student-athletes from eligibility as reflected in this internal NCAA slide:[6]



70.    An HBCU president called Proposition 48 "patently racist."

71.    The SAT administrator called Proposition 48 "patently discriminatory and racist" and "a disservice to minority athletes."

_____

[5] MAN0000382530, at MAN0000382545.
[6] MAN0000327073, at MAN0000327088.

72.    Nevertheless, Proposition 48 became effective in 1986 despite allegations of systemic discrimination.

73.    The NCAA's own subsequent study confirmed that Proposition 48 had a disproportionate impact on Black student-athletes.[7] The study showed that, in 1988, over 80% of ineligible student-athletes were Black.[8] The data suggested that "a disproportionate number of Black student-athletes were kept on a non-graduation track, so by the time their eligibility expired, they seemed so far from graduating that they may have chosen to drop out because of lack of hope."[9]

74.    In or about 1989, the NCAA recruited three professors of quantitative psychology, John J. McArdle, John L. Horn, and John R. Nesselroade, to conduct longitudinal research on Proposition 48.

75.    Each of these NCAA researchers had strong professional ties to psychologist and eugenicist Raymond B. Cattell, who promoted a so-called "scientific religion" called "Beyondism." Beyondism is based on eugenic ideology and competition between racial groups.

76.    Eugenic ideology or "eugenics" is a bigoted and discredited theory that the human race can be improved through screening and reproducing hereditary traits deemed superior and eliminating those deemed inferior.

77.    The NCAA has acknowledged that its academic requirements post-hiring, including the APP, derive from the work done by McArdle and his team.

_____

[7] Todd A. Petr and John J. McArdle, *Academic Research and Reform: A History of the Empirical Basis for NCAA Academic Policy.* J. OF INTERCOLLEGIATE SPORT, 2012, No. 5, 27-40 (available at https://www.ncaa.org/sites/default/files/2018RES_05_petr_JIS_0011_27-40_20180522.pdf).
[8] Associated Press, *Blacks Hit Hard by Proposition 48, Survey Shows.* N.Y. Times Sept. 9, 1988, A25 (available at https://www.nytimes.com/1988/09/09/sports/blacks-hit-hard-by-proposition-48-survey-shows.html).
[9] Douglas Lederman, *NCAA Study Compares Records of Black, White Athletes,* CHRON. OF HIGHER EDUC., July 10, 1991, at A30 (available at https://www.chronicle.com/article/ncaa-study-compares-records-of-black-white-athletes/?cid2=gen_login_refresh&cid=gen_sign_in).

14

78.    In 1990, the NCAA introduced Proposition 42, which removed financial aid for student-athletes who did not fully meet Proposition 48 standards. Proposition 42 was written and sponsored by the Southeastern Conference ("SEC"), which was also the last conference to desegregate and allow Black athletes to participate.

79.    Prop. 42 was subsequently rescinded in the face of intense opposition and protest.

80.    In 1992, the NCAA implemented Proposition 16, which set initial eligibility standards at a minimum 2.5 GPA and minimum SAT or ACT scores, with certain exceptions.

81.    But, at that time, only half of Black college-bound seniors met Proposition 16 requirements, compared to more than two-thirds of white students—an even greater disparity than under Proposition 48.

82.    The NCAA admitted: "The enrollment of African-American student-athletes declined dramatically following the implementation of Propositions 48 and 16…."[10]

83.    In 1993, U.S. Representative Cardiss Collins sent a letter to the NCAA President, contending that the three NCAA researchers "appear to be on the 'self-appointed executive group'" to the "Beyondism Foundation," and referred to Cattell's eugenics-based beliefs as "abhorrent."[11] Representative Collins took the position that the NCAA's links to Cattell invalidated the academic requirements.[12]

---

[10] MAN0000399867, at MAN0000399870.
[11] PETR-MANASSA_0000000082, at PETR-MANASSA 0000000085.
[12] MAN0000595934, at MAN0000595978.

84.    In 1995, 2003, and 2012, the NCAA imposed additional and increasingly stricter reforms to the number of required core courses and sliding scales. For example, for each ten-point drop in SAT scores, the student-athlete had to have a corresponding .025 increase in GPA.[13]

85.    In 1997, more than 19% of Black student-athletes seeking DI initial eligibility were ineligible, as compared to only 3.1% of white student-athletes.[14]

86.    In a 1998 memo, the NCAA conceded that:

> the setting of any initial-eligibility standard leads to an essential tension between two conflicting goals: (1) raising of graduation rates, and (2) allowing more individuals access to the finite number of athletics opportunities available. …This tension is heightened by the fact that a disproportionate number of ethnic minorities are affected adversely by the imposition of these rules.[15]

87.    The NCAA also admitted that Black student-athletes "have been disproportionately impacted by Proposition 16 standards."[16]

88.    In 1999, a federal district court held that Proposition 16 violated Title VI and enjoined the NCAA from its further use. *Cureton v. NCAA*, 37 F. Supp. 2d 687 (E.D. Pa.), *rev'd*, 198 F.3d 107 (3d Cir. 1999). Reversing the district court's decision, the Third Circuit held that 42 U.S.C. § 2000d, *et seq.* applied only to programs receiving federal financial assistance and the NCAA did not receive federal funds. *Cureton*, 198 F.3d at 115-16.

89.    After the Third Circuit's decision, the NCAA reinstated Proposition 16.

90.    During the litigation, the NCAA's DI Board directed a team to evaluate its initial eligibility standards. This group issued several recommendations, including the development of an

---

[13] NCAA, Memorandum from NCAA Division I Academics/Eligibility/Compliance/Cabinet Subcommittee on Initial-Eligibility Issues to Chief Executive Officers, Faculty Athletics Representatives, Directors of Athletics, Senior Woman Administrators, and Compliance Coordinators of NCAA Division I Institutions, July 27, 1998 (including attachments).
[14] *Id.*
[15] *Id.* at Initial-Eligibility Model I attachment, page 3.
[16] *Id.* at Initial-Eligibility Model I attachment, page 2.

"initial-eligibility model, based on research, that employs a weighting scheme that emphasizes black graduates[,]" which "should be used in an effort to reduce adverse impact, while maintaining a similar overall expected graduation rate of Proposition 16."[17]

91.    Rejecting this recommendation, the NCAA instead supported "meaningful incentives/disincentives to encourage the recruitment of student-athletes who can have academic success on that campus."[18]

92.    In 2000, another group of Black student-athletes filed a lawsuit challenging Proposition 16 as purposeful, racial discrimination under 42 U.S.C. § 2000d, *et seq*. and 42 U.S.C. § 1981. *Pryor v. NCAA*, 288 F.3d 548, 552 (3d Cir. 2002) (reversing dismissal where "the complaint sufficiently avers that Proposition 16 has adversely impacted the number of black student athletes who qualify for athletic scholarships, and because it alleges the NCAA adopted this otherwise facially neutral policy 'because of' this adverse, racial impact….").

93.    While *Pryor* proceeded, the NCAA investigated alternative academic performance measures, ultimately implementing the APP.

### C. The NCAA discriminated against Black student-athletes at HBCUs when it considered race in the design and implementation of the APP

#### 1. The Mechanics of the APP

94.    The key components of the APP are the Academic Progress Rate ("APR") and the Graduation Success Rate ("GSR").

95.    Intended to be a long-term assessment of student-athlete academic success, the GSR is the NCAA's calculation of student graduation rates.[19]

---

[17] MAN0000487877, at MAN0000487879.
[18] MAN0000488055.
[19] MAN0000057019, at MAN0000057030, n.1; MAN0000069446, at MAN0000069487-88.

96.    Referred to as a "real-time" assessment of team academic progress,[20] the APR is a team-based measurement of eligibility, retention, and graduation.[21]

97.    Each student-athlete who receives athletic financial aid earns one point for continuing as a full-time student and one point for remaining academically eligible. The team's total points are divided by points possible and multiplied by 1000, resulting in the APR.[22]

98.    The NCAA contends that a 930 APR is a "proxy" for eventual graduation, representing a projected 50% GSR.[23]

99.    Under the APP, there are three levels of penalties, and seven possible Level Three Penalties.

100.    A progressive and cumulative penalty structure, "Level-One" and "Level-Two" Penalties consist of playing and practice restrictions.

101.    A team that receives a Level One Penalty is subject to practice restrictions consisting of four hours per week during the declared playing and practice season as well as an additional required day off. The practice time must be replaced with academic activities. Level One Penalties must be imposed in the academic year following notification of APRs.

102.    A team that receives a Level Two Penalty is subject to playing and practice season restrictions in addition to Level One Penalties, with a reduction from eight hours to four hours per week for athletics activities outside of the playing season. These four hours must be replaced with academically focused activities. Of the remaining four hours of athletics activities, not more than two hours per week may be spent on skill-related workouts. Depending on the sport, additional

---

[20] MAN0000057019, at MAN0000057030; MAN0000069446, at MAN0000069479.
[21] MAN0000069446, at MAN0000069478-79.
[22] MAN0000069446, at MAN0000069479, MAN0000069686.
[23] MAN0000057019.

restrictions are imposed. Level Two Penalties must be imposed in the academic year following notification of APRs.

103.    Level Three Penalties subject a team to one of seven penalty types, such as financial aid penalties, practice and contest reductions, recruiting restrictions, incoming student practice restrictions, or postseason competition bans.

104.    APP penalties are applied in later academic years than they are earned.

105.    While teams may appeal the penalties or may otherwise seek to avoid the penalties based on certain filters or waivers, the first step of the APP disproportionately impacts, and thus discriminates against, DI HBCUs and the Class.

### 2. The APP's Discriminatory Treatment of DI HBCUs and the Class

106.    In 2002, the NCAA's internal documents noted that the "Purpose of the Historical-Penalty Structure" was to target the "worst-of-the-worst" schools and their athletes.[24]

107.    The NCAA's DI Vice President later made clear that "the worst of the worst" referred to HBCUs.[25]

108.    The target remained the same in 2004 when the NCAA implemented the APP, which measures a team's academic eligibility rather than an individual's eligibility.

109.    While announcing the APP's creation in 2004, NCAA President Brand explicitly stated that the program was designed to respond to the allegations of discrimination against Black student-athletes.

---

[24] MAN0000513072.
[25] MAN0000012293, at MAN0000012294.

110.    Despite the NCAA's claims that the APP "will produce improved graduation performance . . .without having a disparate impact on ethnic minorities,"[26] the NCAA knew that use of GSRs would have a disparate impact on Black student-athletes.

111.    For example, in the 1998-99 school year, the GSR for Black student-athletes was 59% versus 82% for white student-athletes.[27]

112.    The following NCAA chart depicts annual GSR rates for certain white student-athletes (solid black line) and Black student-athletes (solid red line), pre- and post-dating the APP:[28]



113.    The NCAA chose to rely upon the GSR despite the negative impact on Black student-athletes.

114.    In 2006, the NCAA HBCU Ad Hoc Advisory Group met with, *inter alia*, the NCAA to discuss the negative impact of APP penalties on HBCUs and their Black student-athletes:[29]

---

[26] MAN0000063271, at MAN0000063272.
[27] PLFS-TM-002738.
[28] MAN0000065182, at MAN0000065210.
[29] MAN0000488547, at MAN0000488548 (highlighting added).

Report of the HBCU Ad Hoc Advisory Group
November 28, 2006
Page No. 2

---

adjustment had not been in place, 943 teams would have been below the APR cutoff, including 681 men's or mixed teams and 262 women's teams.

A closer examination of second year APR data suggests that, if current behaviors and trends continue, a disproportionate number of historically black colleges and universities (HBCU) will be subject to penalties once squad size adjustments are eliminated. While HBCUs make up only about six percent of the total Division I colleges and universities, these institutions represented 17 percent of the total sports teams falling below the 925 APR cutoff and potentially subject to penalties in the future.

115.    The HBCU representatives explained that "many HBCUs, through open enrollment policies, serve a demographic that may be hampered by inadequate primary and secondary school systems, as well as economic pressures…."[30]

116.    However, rather than adjusting the APP, the NCAA merely established "an ad hoc advisory group" of HBCUs to communicate concerns to the NCAA.

117.    In early 2011, in response to public exposure and criticism of the APP's disparate impact on Black student-athletes, the NCAA discussed the purpose of the APP, graduation targets, and potential changes.

118.    The NCAA Director of Academic and Membership Affairs repeated previous criticisms of the APP, i.e., that graduation targets did not correspond with student-body graduation rates and that HBCUs were being penalized as a result.

119.    While framing potential ways to address the impact on HBCUs, she suggested that a "new benchmark be established for … HBCU institutions," and asked "How should APP penalties impact HBCUs that may not have the resources to allocate to improving academic performance and have unique academic missions?"[31]

---

[30] MAN0000488547, at MAN0000488548.
[31] MAN0000065426, at MAN0000065429.

120.    The NCAA's Principal Research Scientist responded:

> *Politically, perhaps better to keep phrasing this as a resource issue in the public forum than as an HBCU issue*. . . . Internally, we can certainly recognize that the HBCUs are struggling to enact necessary changes to hit those academic benchmarks.[32]

121.    He also admitted that some schools (PWIs) got away with low performing students, while others (HBCUs) were penalized despite team performance exceeding their student bodies.[33]

122.    However, rather than recognize and accommodate HBCUs' unique academic mission, he suggested that the NCAA should penalize HBCUs if they did not increase their initial eligibility standards and reduce the number of admitted student-athletes who are "academic risks."[34]

123.    In February 2011, internal NCAA discussions show that it "kn[e]w clearly that a 925 [cut score] would pick up primarily HBCU teams."

124.    The DI Committee on Academic Progress had a "lengthy conversation about HBCU issues" which resulted in "no specific recommendation as to what to do," and a "[p]hilosophical discussion as to whether we should only be concerned *with the 'worst of the worst' – those really low performing schools, which would be HBCUs*."[35]

125.    Later in 2011, the NCAA increased the APR cut score to 930,[36] knowing it "would pick up [i.e., penalize] primarily HBCU teams."[37] In response, paying lip service to a recommendation to form a group to "assist on issues that impact HBCU institutions,"[38] the NCAA

---

[32] MAN0000065426, at MAN0000065428 (emphasis added).
[33] MAN0000065426.
[34] MAN0000065426, at MAN0000065428.
[35] MAN0000012293, at MAN0000012294 (emphasis added).
[36] PLFS-TM-002177.
[37] MAN0000012293, at MAN0000012294; MAN0000527887 at MAN0000527893, MAN0000527900.
[38] MAN0000026260, at MAN0000026269.

replaced the HBCU Ad Hoc Committee with the HBCU Advisory Group,[39] whose concerns were largely ignored.[40]

126.    In 2012, the NCAA's Principal Research Scientist delivered a keynote in which he stated that the Committee on Academic Progress was concerned about "APR trending" at HBCUs, "some of which have not shown improvement and in some cases have actually regressed in their APRs" due to factors that include "admissions profiles" and "mission."[41]

127.    He observed that these trends "should lead to further discussion of tailored approaches to [progress-toward-degree eligibility]."[42] And he suggested that schools consider "capping the number of high-risk student-athletes admitted at any given time"[43] in contradiction to the HBCU mission.

128.    But it was not just the NCAA research scientists setting the discriminatory cut scores. Rather, the research scientists presented the data to NCAA decision-makers to make value judgments about increasing cut scores at the expense of HBCU Black student-athletes.[44]

129.    Thus, the increasingly high APR cut scores – which the NCAA knew would disproportionately and adversely affect HBCU Black student-athletes – reflected the NCAA's intent.

130.    In 2013, Dr. John Rudley, an HBCU president, chairman of the Southwestern Athletic Council ("SWAC," an HBCU conference) of Presidents and Chancellors, and former chair of the HBCU Academic Advisory Group (later the HBCU and Low Resource Institution Academic Advisory Group), observed that:

---

[39] MAN0000764487.
[40] MAN0000764487.
[41] MAN0000061238, at MAN0000061240-41 .
[42] MAN0000061238, at MAN0000061244.
[43] MAN0000057019, at MAN0000057030.
[44] MAN0000281453, at MAN0000281455 (highlighting added).

the voices of the larger schools, the Bowl Championship Series Schools, the wealthier schools, seem to carry more weight than those of us designated as HBCUs…. Our challenge, as we see it, is to express to the NCAA that one size does not fit all. *We contend that the NCAA APR standard conflicts with the mission of our universities. We emphatically state that we are fulfilling our mission*.[45]

131.    In early 2013, then-NCAA President Mark Emmert fielded calls directly from HBCUs seeking relief from the disproportionate impact of the APP,[46] but the NCAA refused to include all HBCUs in certain penalty relief afforded to other schools.[47]

132.    A May 2014 NCAA presentation reflected that HBCUs fell below the APR's 930 cut score more than non-HBCU schools, and the number of teams subject to penalties increased from 51 to 170, of which 55% were HBCUs.[48]

133.    Moreover, while just 2.7% of all DI teams fell below a 930 APR in multiple years, 25.4% of HBCU teams were in this category.[49] In 2015, 76% of the teams below 930 were HBCUs, and 15 of 21 teams receiving postseason bans were HBCUs.[50]

134.    Yet in 2016, the NCAA again increased initial eligibility requirements, rejecting concerns from the National Association for Coaching Equity and Development about the impact on Black student-athletes.[51]

135.    Multiple studies confirmed what the NCAA had always known: HBCUs trended well below PWIs in terms of APR, eligibility, retention, and the number of athletes who left high school academically ineligible, and comprised a large percentage of teams with APRs < 930.[52]

---

[45] PLFS-TM-002181, at PFS-TM-002183 (emphasis added).
[46] MAN0000185179.
[47] MAN0000185179.
[48] MAN0000034737, at MAN0000034767, MAN0000034799.
[49] MAN0000034737, at MAN0000034801.
[50] MAN0000057943, at MAN0000057947; PLFS-TM-002185, at PLFS-TM-002186.
[51] MAN0001019111; PLFS-TM-002201.
[52] PLFS-TM-002190, at PLFS-TM-002195-96. *See also* MAN0000029015, at MAN0000029018.

136.    In 2018, internal NCAA staff were developing the Board of Directors Strategic Areas of Emphasis for 2018-2023. One draft suggestion was to "[e]xamine the Academic Performance Program . . . to ensure the standards appropriately include institutional mission as part of the criteria for determine [sic] penalized teams or institutions."[53] However, the NCAA has not incorporated the HBCU mission into its performance measures to date.

137.    APP penalties have been disproportionately levied against HBCUs for over a decade. Only 6.5 percent of Division I schools are HBCUs. However, of the 140 teams that the NCAA has penalized between 2013 and 2019, 127 of them were HBCU teams.

138.    Although the NCAA often lumps HBCUs with similarly low-resourced PWI institutions and directs aid broadly to low-resource institutions generally, research has shown that a lack of institutional resources is a poor predictor of whether an institution will be subject to APP penalties. Rather, the institution's status as an HBCU is the strongest indicator of whether the NCAA will impose APP penalties on a school.[54] According to the study, HBCUs are 6 to 8 times more likely to be penalized than similarly resourced, non-HBCU institutions.

139.    As an HBCU, Grambling State's athletic teams have received APP penalties in the past. The Grambling State women's basketball team specifically has received Level One and Two penalties. Other Grambling State teams like men's basketball have received Level Three penalties before as well.

---

[53] MAN0000928198, at MAN0000928200. *See also* MAN0000928198 (comment to document appearing in extracted text, not visible on exhibit image); MAN0000928198 (extracted text).
[54] Ryan J.R. Westman, Investigating Equity: An Evaluation of the Relationship of the NCAA's APR Metric on Similarly Resourced Historically Black and Predominantly White NCAA Division I College and Universities, Seton Hall Univ. Dissertations & Theses (Aug. 23, 2018), https://scholarship.shu.edu/cgi/viewcontent.cgi?article=3664&context=dissertations.

140.    Certain APP penalties were temporarily suspended in 2020 due to COVID, but the NCAA continued to run the APP program, collecting the data for purposes of resuming penalties based on the four-year-cohort scores released in spring 2024.

141.    While the NCAA offered conditional waivers for one type of Level Three Penalty (post season competition ban) earned in 2024 due to the lingering effects of COVID, the NCAA has not further suspended other APP penalties.

142.    For example, in June 2024, the NCAA announced Level One Penalties (based on the four-year rolling data ending 2022-23) imposed on 39 teams, of which 22 were HBCU teams.

### 3. The APP's Rewards to PWIs

143.    The NCAA now rewards schools who consistently achieve high APRs. The Public Recognition Program awards top-performing teams based on their most recent multiyear APR.[55]

144.    Additionally, enacted in 2016 and beginning this year, the NCAA now provides financial awards to schools that reach an APR of 985 or higher in the preceding year, a GSR of 90 percent or more the previous year, or a graduation rate that is 13 or more points greater than federal graduation rate.

145.    Projected distributions begin at $111,000 and are expected to reach $473,000 in 2025-2026. This money will be distributed without restrictions and will increase annually.

146.    The NCAA projects that 66 percent of member schools will qualify each year. Yet, for academic year 2018-2019 (the last year the NCAA made this data publicly available), no MEAC or SWAC (the main HBCU conferences) school has a GSR above 90 percent.

---

[55] NCAA Division I Academic Performance Program Manual, at 146.

**D.  The NCAA's conduct has and will continue to injure Class Members**

147.    The APP imposes barriers on Black student-athletes at HBCUs that place them on unequal footing with student-athletes at PWIs with respect to, *inter alia*, meeting APP standards, avoiding APP penalties, receiving APP awards, and competing in collegiate athletics without the burden and distraction of the discriminatory APP.

148.    Because of the APP, Plaintiff and Class members are held to a higher, more burdensome academic standard than the student bodies at their HBCUs, unlike student-athletes at PWIs where student-athletes are held to similar or lower standards than their schools' student bodies, thereby demanding more study time, more stress, and less playing time.

149.    Unequal treatment and the deprivation of equal participation are in and of themselves injuries regardless of whether Class members were able to overcome such treatment and were not punished.

150.    Class members were and are injured by the APP regardless of whether penalties were actually imposed or other harms occurred.

151.    Moreover, because the APP uses a four-year rolling average in its calculation, student-athletes are impacted by conduct that occurred while they were still in high school.

152.    And the penalty structure is cumulative, so each year of below-benchmark APRs leads to another year of more harmful penalties and less rewards. Therefore, class members can be penalized in part based on conduct that occurred well before their matriculation.

153.    Class members were not provided full information about the potential consequences of the NCAA's discrimination against Black student-athletes at HBCUs. As a result, unbeknownst to them, they entered their Contracts with substantial disadvantages and effects.

154.    All Black student-athletes at Division I HBCUs are currently suffering from, and at significant risk of further, irreparable harm, i.e., racially discriminatory interference with the

27

making and enforcing of valid Contracts due to the NCAA's implementation and enforcement of the APP.

155.    The harm associated with the APP cannot be undone, reversed, or adequately remedied by monetary compensation.

156.    Proactive injunctive relief is necessary to eliminate the discrimination and protect student-athletes at Division I HBCUs. This common irreparable harm is measurable and directly traceable to the actions and inactions of Defendant.

## TOLLING OF STATUTE OF LIMITATIONS

157.    The running of any applicable statute of limitations has been tolled by reason of the discovery rule, Defendant's fraudulent concealment, and/or Defendant's continuing violations.

158.    The NCAA's racial discrimination and tortious conduct has been continuous and ongoing since at least the inception of the APP until present. Each act to enforce the APP and/or a penalty associated with it constitutes a new injury; a new discriminatory interference with Class members' right to make and enforce contracts; and a new act of fraud.

159.    Black student-athletes did not know, and did not have enough information as laypeople to know, that the administration and enforcement of the APP and their related injuries were a result of intentional discrimination.

160.    Moreover, the NCAA insisted, and continues to insist, that the APP and its penalties are applied fairly, do not discriminate against Black student-athletes or HBCUs, and are equitable. The NCAA controls the release of data concerning APR calculations, the identity of low-resource institutions, and the application of penalties. The NCAA concealed from the Class members these facts and the true, racially discriminatory nature of the APP.

161.    Class members were unaware of and could not have reasonably known or learned through due diligence that the NCAA and its APP discriminated against them.

162.    Moreover, the NCAA's conduct and decision-making associated with the APP represent a pattern of behavior over time rather than a single one-off event, making it difficult for Plaintiff to ascertain the actual date of discrimination against her.

## CLASS ALLEGATIONS

163.    Plaintiff brings this action on behalf of the following Class pursuant to Fed. R. Civ. P. 23(b)(2): "All Black student athletes participating in Division I HBCU athletic teams at any time from the date the lawsuit was filed through the present."

164.    Excluded from the Class are Defendant and any of its affiliates, parents, subsidiaries, officers, and directors; any entity in which Defendant has a controlling interest; all persons who make a timely election to be excluded from the class; governmental entities; and all judges assigned to hear any aspect of this litigation, including their immediate family members.

165.    Numerosity: According to the NCAA's publicly available Demographic Database, there were 6,156 Black student-athletes at DI HBCUs in 2023. As such, the members of the Class are so numerous that joinder is impractical.

166.    Typicality: Plaintiff's claims are typical of the claims of other Black student-athletes at Division I HBCUs.

167.    Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests at the time she filed this lawsuit and the interests of all other members of the Class are identical, and Plaintiff is cognizant of her duty and responsibility to the Class. Accordingly, Plaintiff can fairly and adequately represent the interests of the Class. Moreover, Plaintiff's counsel is competent and experienced in litigating class actions, including litigation of this kind. Plaintiff and counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

168.     Commonality: There are numerous questions of law and fact common to this Class, including, but not limited to:

(a)     Whether the NCAA's APP program discriminates against HBCUs and their Black student-athletes;

(b)     Whether that discrimination is intentional and race-based;

(c)     Whether the NCAA's discriminatory acts interfere with the Class's ability to make, enforce, and enjoy the benefits of their contracts;

(d)     Whether the NCAA's conduct has caused members of the Class's injury; and

(e)     The scope of the injunctive relief to which Class members are entitled.

169.     Equitable relief: Class certification is appropriate under Rule 23(b)(2) because Defendant has acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief is appropriate with respect to the Class as a whole. Such injunctive relief includes, but is not limited to, the implementation of systemic changes to prevent such conduct in the future as mentioned above.

170.     This action is properly maintainable under Rule 23(c)(4) in that there are issues common to the Class that are most efficiently and appropriately resolved via class action and would advance the disposition of this matter.

### CAUSES OF ACTION

### COUNT I
### VIOLATION OF CIVIL RIGHTS
### 42 U.S.C. § 1981

171.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth in full herein.

172.    Section 1981, as amended in the Civil Rights Act of 1991, provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (1991).

173.    Section 1981 defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).

174.    All Class members, including Plaintiff, are Black and thus members of a racial minority that are a protected class under Section 1981.

175.    Plaintiff's and the Class's agreements to the NCAA's rules, as evidenced by the Student-Athlete Statements and their participation in DI athletic teams, constitute valid, binding contracts.

176.    The Manual reflects the NCAA's promises that eligible student-athletes will have opportunities to compete without barriers based on race and that their academic progress will be judged on the same basis as the student-body at their respective schools. Notwithstanding this contractual promise, the NCAA required student-athletes to meet a single APR, judging HBCU Black student-athletes' academic progress against this APR and not against the student body at their schools.

177.    The NCAA's academic requirement programs have consistently discriminated against Black student-athletes at HBCUs. The NCAA claims it created the APP in part to address allegations of race discrimination in past litigation, as well as low graduation rates of Black student-athletes as compared to white student-athletes. Indeed, the NCAA's in-house quantitative psychologist, when discussing the impact of the APP, even suggested that a solution could be to

"cap" the number of "high-risk student athletes at any given time."[56] Accordingly, race was a but-for cause of the NCAA's establishment of the APP and its penalty structure.

178.    The NCAA's adoption of the APP, including its penalty structure and postseason access bans, as well as the numerous preceding series of NCAA propositions and reforms, represent a pattern or practice of discrimination against Black student-athletes at HBCUs on the basis of race.

179.    The NCAA set the APR knowing the likelihood that HBCU teams would disproportionately be unable to meet the APR.

180.    The NCAA intended to discriminate based on race through the APP. The NCAA's racially discriminatory intent is demonstrated by, *inter alia*, (i) the impact of the APP, which bears most heavily on Black student-athletes at HBCUs;   (ii) the existence of a clear pattern, unexplainable on grounds other than race, which has been demonstrated by the statistical analysis in this litigation; (iii) the historical background of the NCAA's serial academic programs which the NCAA knew had a disparate impact on Black student-athletes at HBCUs; (iv) the specific sequence of events leading up to the APP; and (v) administrative history reflected in contemporary statements by NCAA employees, presidents of NCAA member institutions, and NCAA committee members, as reflected in minutes of its meetings and other reports.

181.    According to Bernard Siskin, Ph.D., the APP "had a highly statistically significant and large adverse impact on HBCU teams and their predominately Black student-athlete Class members."

---

[56] Thomas Paskus, *A Summary and Commentary on the Qualitative Results of NCAA Academic Reforms*, J. Intercollegiate Sport, No. 5, 41, 52 (2012), available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://core.ac.uk/download/pdf/200288456.pdf.

182.    In statistical terms, the disparity exceeds more than eight standard deviations. Standard deviations greater than two to three refute the suggestion that decisions were made without regard to race.

183.    Thus, the APP was not race-neutral; race played a role in the NCAA's decision-making process.

184.    The very fact that HBCUs make up 6.5 percent of Division I institutions but make up 90 percent of the institutions that have received Level Three Penalties in the past decade is indicative of the NCAA's intentional discrimination. This is particularly true where the persistent disparities have remained over years of amendments.

185.    Similarly, in June 2024, the NCAA announced Level One Penalties (based on the four-year rolling data ending 2022-23) imposed on 39 teams, of which 22 were HBCU teams. Thus, while HBCUs make up just 6.5 percent of DI schools, their teams accounted for 56 percent of the Level One Penalties announced this year – again demonstrating the NCAA's intentional discrimination.

186.    Black student-athletes at HBCUs have faced and continue to face active, ongoing injury because the APR threshold is itself discriminatory. It unfairly and disparately burdens Black student-athletes at HBCUs, requiring them to meet or exceed the academic standards for their schools' general student body, while allowing student-athletes at PWIs to fall short of their schools' academic standards.

187.    The APP imposes barriers on Black student-athletes at HBCUs that place them on unequal footing with student-athletes at PWIs with respect to, *inter alia*, meeting APP standards, avoiding APP penalties, receiving APP awards, and competing in collegiate athletics without the burden and distraction of the discriminatory APP.

188.    Plaintiff and other Class members were (and Class members continue to be) discriminated against by the barrier the APP imposes – and all that the barrier brings even if they surpass it and go on to achieve success under the APP. The Class is held to higher, more burdensome academic standards – demanding more study time, more stress, less playing time, inflicting emotional harm, and saddling them with difficulties PWI student-athletes do not face under the APP.

189.    Put simply: the NCAA makes it harder for Black student-athletes at HBCUs to be successful under the APP—and in intercollegiate athletics—than others. That deprives them of equal participation and is discriminatory.

190.    This denial of equal treatment resulting from the imposition of the APP injured Plaintiff and the Class members.

191.    As a result of Defendant's actions, Plaintiff and Class members have suffered and Class members will continue to suffer injury absent injunctive relief.

192.    Accordingly, Plaintiff seeks injunctive relief to prevent the implementation or enforcement of the APP and equitable relief in the form of a monitor to ensure that future academic benchmarks, used by the NCAA to reward or penalize student-athletes or teams, do not discriminate against Black student-athletes at DI HBCUs.

## COUNT II
## VIOLATION OF CIVIL RIGHTS
## 42 U.S.C. § 1985(3)

193.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth in full herein.

194.    The NCAA and its member institutions conspired for the purpose of depriving, either directly or indirectly, Black student-athletes at DI HBCUs from seeking the equal protection of the laws and from enjoying the equal rights, or equal privileges and immunities of citizens under

the laws of the United States and the various states of the United States, including, but not limited to, their rights to freedom of movement and travel, association and assembly, and right to contract; and their rights not to be enslaved nor deprived of life and liberty other than by due process of law.

195.    The stark disparity in the application of APP penalties, the direct statements made by NCAA decisionmakers about the APP, the context surrounding the APP's creation, and the disparity of penalties imposed on DI HBCU teams support an inference that the NCAA's actions were motivated by racial animus, and the discrimination against this identifiable class was invidious.

196.    Defendant intentionally discriminated against Black student-athletes at DI HBCUs to deprive them of the equal protection of, or equal privileges and immunities under, the law.

197.    The NCAA has committed acts in furtherance of this conspiracy to deprive Black student-athletes at HBCUs through the creation, implementation, and enforcement of the APP.

198.    The APP unfairly and disparately burdens Black student-athletes at HBCUs, requiring them to meet or exceed the academic standards for their schools' general student body, while allowing student-athletes at PWIs to fall short of their schools' academic standards.

199.    The APP imposes barriers on Black student-athletes at HBCUs that place them on unequal footing with student-athletes at PWIs with respect to, *inter alia*, meeting APP standards, avoiding APP penalties, receiving APP awards, and competing in collegiate athletics without the burden and distraction of the discriminatory APP.

200.    Plaintiff and other Class members were (and Class members continue to be) discriminated against by the barrier the APP imposes – and all that the barrier brings even if they surpass it and go on to achieve success under the APP. The Class is held to higher, more burdensome academic standards than the student bodies at their HBCUS– demanding more study

time, more stress, less playing time, inflicting emotional harm, and saddling them with difficulties PWI student-athletes, who are faced with academic standards equivalent to or lower than their student bodies,  do not face under the APP.

201.    Class members were deprived of their right to appeal their individual grievances as they had no knowledge of the impending team-wide penalties when they signed their contracts.

202.    Class members were required to continue to stay, perform, and play for their NCAA banned schools under altered terms or lose educational scholarships, suffer potential further penalties regarding eligibility upon transfer to another school, and/or forego the freedom to attend an HBCU with all its attendant advantages.

203.    As a result of Defendant's actions, Class members have suffered and will continue to suffer injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Class, respectfully requests that the Court enter a judgment on their behalf and against the NCAA, and further grant the following relief:

A. Certify the proposed Class pursuant to the Federal Rules of Civil Procedure, Rule 23(a) and (b)(2);

B. Designate Plaintiff as representative of the proposed Class, and Plaintiff's counsel as Class counsel;

C. Award injunctive relief and equitable relief as may be appropriate to enjoin and prevent further discrimination;

D. Award Plaintiff and the Class members' attorneys' fees and costs; and

E. Award to the Plaintiff and Class members such other relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff, individually and on behalf of the proposed Class, respectfully requests a trial by jury as to all matters so triable.

Dated: October 21, 2024                     Respectfully submitted,

By:    */s/ Elizabeth A. Fegan*

Elizabeth A. Fegan (admitted pro hac vice)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100
beth@feganscott.com

Ashali P. Chimata (admitted pro hac vice)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (771) 244-6729
Facsimile: (312) 264-0100
Ashali@feganscott.com

Jessica Meeder (admitted pro hac vice)
MAY JUNG, LLP
2006 MLK Jr. Ave. SE, Ste. 210
Washington, DC  20020
Telephone: (202) 916-7289
Facsimile: (202) 618-8282
jessica@mayjung.com

William N. Riley, Bar No.: 14941-49
Russell B. Cate, Bar No.: 27056-29
RILEYCATE, LLC
11 Municipal Drive, Suite 200
Fishers, IN 46038
Telephone: (317) 588-2866
Facsimile: (317) 458-1875
wriley@rileycate.com
rcate@rileycate.com

*Attorneys for Plaintiff and*
*the Proposed Class*